Carl JOHNSTON, Plaintiff–Appellee,

v.

HARRIS COUNTY FLOOD CONTROL
DISTRICT, et al.,
Defendant–Appellant.

No. 87–2970.

United States Court of Appeals,
Fifth Circuit.

April 17, 1989.
Rehearing Denied May 22, 1989.

David H. Melasky, Mike Driscoll, Rock William August Owens, County Attys., Houston, Tex., for defendant-appellant.

James Patrick Wiseman, Austin, Tex., Beatrice Mladenka–Fowler, Eric H. Nelson, Houston, Tex., for plaintiff-appellee.

Before GEE, SNEED,* and WILLIAMS, Circuit Judges:

GEE, Circuit Judge:

Having been unsuccessful at trial, the defendants in this civil rights action raise a multitude of challenges to the district court's finding of liability. Their appeal requires us to review the district court's disposition of two pretrial issues, its finding of liability under Title VII and § 1983, its computation of damages and, finally, its award of attorney's fees. We affirm the district court's opinion on all issues save one, its computation of damages. Accordingly, we affirm in part and reverse in part, remanding the case for a recalculation of the damage award.

Carl Johnston (Johnston), the plaintiff in this case, began working for the Harris County Flood Control District (HCFD) as an hourly laborer in 1950. By 1977, Johnston had advanced to a supervisory position; he continued to work in that capacity until HCFD terminated his employment in 1981. Johnston's tenure with HCFD was long but not always peaceful. The directors of HCFD received many complaints about Johnston over the years, including complaints that he exhibited racial bias and played favorites. Moreover, Johnston had problems with HCFD's purchasing procedures that resulted in equipment purchases exceeding Johnston's authority. Despite these difficulties, Johnston's position at HCFD appears to have remained secure.

In 1980, Marilon Speed, another HCFD employee, filed an Equal Employment Opportunity charge against HCFD. The Harris County Commissioner's Court convened an Equal Employment Opportunity hearing (the EEO hearing) to review Ms. Speed's allegations. Johnston testified at the hearing on behalf of Speed; his testimony was not favorable to HCFD and its directors. Embarrassed by Johnston's testimony, James B. Green, the director of HCFD, lashed out at Johnston with a series of retaliatory employment actions. HCFD's retaliatory efforts culminated when it attempted to force Johnston to accept a demotion. When Johnston refused, HCFD terminated his employment.

Johnston then filed this action against HCFD and its individual directors, alleging violations of Title VII, § 1983, federal age and handicap discrimination laws and a variety of state laws. The age and handicap discrimination claims and the state claims were dismissed before trial. After considerable jockeying, the case proceeded to trial. Johnston maintained that HCFD's scheme of retaliation violated both § 704(a) of Title VII and the First Amendment. HCFD insisted that Johnston's racial attitudes and poor performance provided legitimate, non-retaliatory justifications for firing him. Rejecting HCFD's proffered justifications as pretextual, the court found HCFD liable under Title VII and § 1983 and awarded Johnston actual and punitive damages as well as attorney's fees. HCFD's appeal raises issues from every stage of the litigation; we review each of HCFD's challenges in turn.

1. Disqualification of Johnston's Counsel

Casting an unusual light on an attorney's ethical obligation to maintain his client's confidences, HCFD contends, without merit, that the district court erred when it denied HCFD's motion to disqualify Johnston's attorneys. Under Texas state law, the Harris County Attorney's Office represents HCFD in legal matters. At the time of Marilon Speed's EEO hearing, Anthony Sheppard was an Assistant County Attorney. Sheppard attended and participated in the Speed EEO hearing, questioning witnesses and drawing up the Commissioner's Court's order. HCFD asserts that Shep-

* Circuit Judge of the Ninth Circuit, sitting by designation.

pard represented HCFD at the EEO hearing, thus creating an attorney-client relationship between Sheppard and HCFD for purposes of the Speed matter. Johnston's attorneys contacted Sheppard during the discovery period of Johnston's action against HCFD and called Sheppard as a witness at trial. As a result, HCFD maintains, Johnston's attorneys caused Sheppard, HCFD's purported former counsel, to disclose information he learned while representing HCFD and, thus, to violate his ethical obligation to maintain HCFD's confidences. The district court denied HCFD's request to disqualify Johnston's attorneys three times; it was correct each time.

■ On review of a motion to disqualify counsel, we review findings of fact for clear error "while carefully examining the district court's application of relevant ethical standards." *Cossette v. Country Style Donuts, Inc.*, 647 F.2d 526, 531 (5th Cir. 1981) (citations omitted); *Brennan's, Inc. v. Brennan's Restaurants, Inc.*, 590 F.2d 168, 171 (5th Cir.1979) (citation omitted). In this Circuit, we do not mechanically apply the rule of disqualification. *Cossette*, 647 F.2d at 530 (citing *Church of Scientology v. McLean*, 615 F.2d 691, 692 (5th Cir.1980)). Rather, we scrutinize the "precise nature of the relationship between present and former representations." *Duncan v. Merrill Lynch, Pierce, Fenner & Smith*, 646 F.2d 1020, 1029 (5th Cir. Unit B), *cert. denied*, 454 U.S. 895, 102 S.Ct. 394, 70 L.Ed.2d 211 (1981). A party seeking to disqualify opposing counsel on the ground of a former representation must establish two elements: 1.) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify and 2.) a substantial relationship between the subject matter of the former and present representations. *In re Corrugated Container Antitrust Litigation*, 659 F.2d 1341, 1345 (5th Cir. Unit A 1981); *Duncan*, 646 F.2d at 1028. HCFD does not contend that *Johnston's attorney's* represented *HCFD* and, therefore, cannot represent a party adverse to HCFD. Rather, HCFD maintains that Sheppard, one of Johnston's witnesses, represented HCFD and that the confidences and ethical obli-

gations that arose in Sheppard's relationship with HCFD extend to Johnston's attorneys. Thus, we examine Sheppard and HCFD's relationship to determine whether any aspect of that relationship precludes Johnston's attorneys from interviewing Sheppard or from calling Sheppard as a witness.

■ As HCFD and Sheppard did not have an attorney-client relationship with respect to the Speed EEO dispute, the district court did not err when it denied HCFD's motions to disqualify Johnston's counsel. HCFD ignores the "precise nature" of its relationship with Sheppard when it insists that an attorney-client relationship existed for the Speed EEO matter. At most, Sheppard's role in the Speed matter was ambiguous. Sheppard testified that he acted as an impartial figure at the hearing, performing a role analogous to that of an arbitrator or an impartial hearing officer. A review of the EEO hearing transcript reveals that Sheppard conducted the questioning, advised the Commissioner's Court, and drew up the Court's order. We cannot say precisely what function Sheppard performed, but we can say what function he did not perform: that of an advocate acting on behalf of HCFD—or of HCFD's individual officers or even of Marilon Speed. Furthermore, Sheppard's preparation for the hearing demonstrates that he did not act as HCFD's counsel. Before he attended the hearing, Sheppard explored the consequences of acting as an impartial participant instead of HCFD's advocate. Shephard believed that, if the hearing did not resolve the dispute and Speed brought a civil action against HCFD, he could not represent HCFD in the civil action; a conflict of interest would arise if an attorney functioned as an impartial participant at one stage of a controversy but chose sides and acted as an advocate for one party at the next stage. Sheppard attended the EEO hearing under the assumption that his action would prevent him from representing HCFD in a future proceeding on the same dispute, an assumption incompatible with an attorney-client relationship. Finally, Sheppard's actions following the Speed

hearing preclude any conclusion that he and HCFD had an attorney-client relationship for the purposes of the Speed matter. When Ms. Speed felt that HCFD was violating the Commissioner's Court's order, she turned to Sheppard, who contacted HCFD, counselling it to comply with the order. If Sheppard was HCFD's attorney, it would be unusual for Ms. Speed to have sought his assistance to force HCFD to comply with the order or that Sheppard would offer such assistance. We cannot conclude that an attorney-client relationship existed and, thus, Sheppard was under no obligation to refrain from sharing the information he learned during the Speed dispute.

■ Even if Sheppard and HCFD had an attorney-client relationship, however, we would affirm the district court. This case is analogous to *Brennan's, Inc. v. Brennan's Restaurants, Inc.* In *Brennan's,* a corporation split into two, competing entities. 590 F.2d at 170–71. The attorney for the original corporation chose to work for one of the new entities, severing his ties with the other. *Id.* When litigation arose between the two new entities, the attorney retained co-counsel. *Id.* We affirmed the first attorney's disqualification because of his former relationship with the original corporation. *Id.* at 172. The new co-counsel, however, was not necessarily subject to disqualification for two reasons: there was no previous attorney client relationship between the co-counsel and the original client and the information that the co-counsel learned from the disqualified counsel may not have been privileged, confidential or intended to remain undisclosed. *Id.* at 173–74. Similarly, the information Sheppard shared with Johnston's attorneys was not intended to be privileged, confidential or undisclosed. Rather, Sheppard gained his knowledge during a hearing that was a matter of public record. Even assuming that Sheppard had a duty to protect HCFD's confidences in the Speed matter, no confidential information came to light at the public hearing. Johnston's attorneys were free to question Sheppard about the EEO hearing. As the district court did not

abuse its discretion, we affirm its decision not to disqualify Johnston's counsel.

## 2. HCFD's Motion for Continuance

■ Fifteen days before the trial began, HCFD requested a continuance on the ground that defendant Jordan, who had suffered a heart attack, was unable to attend trial. When the court ruled on HCFD's motion, Jordan's physician did not know when, if ever, Jordan would be able to appear. The court denied the motion and set the case for trial. On the first day of trial, HCFD again broached the subject of a continuance. Reminding the court that it was proceeding without one of the named defendants, HCFD presented the court with new information. According to a letter from Jordan's physician, postponing the trial for one month would be beneficial to Jordan's health. As the district court noted, the physician again did not indicate when, if ever, Jordan's health would permit him to attend trial. The court conducted the trial without Jordan, but held open the evidence until Jordan was able to testify. On appeal, HCFD contends that Jordan's presence was necessary to assist counsel in rebutting the testimony of Johnston's witnesses and that Jordan's absence was prejudicial. In addition, HCFD requested a thirty day continuance, a delay which it asserts was reasonable. HCFD urges that the court abused its discretion when it denied HCFD's motion to continue the trial. We disagree.

The district court did not err when it denied HCFD's motion for a continuance. The grant or denial of a continuance is within the sound discretion of the trial court. *Harmon v. Grande Tire Co., Inc.,* 821 F.2d 252, 256 (5th Cir.1987) (quoting *Harvey v. Andrist,* 754 F.2d 569, 572 (5th Cir.), *cert. denied,* 471 U.S. 1126, 105 S.Ct. 2659, 86 L.Ed.2d 276 (1985)); *Fontenot v. Upjohn Co.,* 780 F.2d 1190, 1193 (5th Cir. 1986) (footnote omitted). We will reverse the denial of a continuance "only when the action is, to use the conventional term, 'an abuse of discretion.'" *Fontenot,* 780 F.2d at 1193 (footnote omitted). All of the defendants except Jordan were present at trial and able to assist HCFD's counsel in

formulating cross-examination questions and rebuttal testimony. HCFD has not shown that relying on the other defendants created any prejudice. Furthermore, a continuance would not require the court to wait a mere thirty days for Jordan's health to improve. If the court did not try the case in September 1985, it could not hear the case until the spring of 1986, a far longer delay than the thirty days HCFD suggests. Finally, the court held open the evidence until Jordan was able to testify and then heard his testimony. Given the lack of prejudice, the length of delay, and the court's generous efforts to accommodate Jordan, we cannot conclude that the district court abused its discretion.

### 3. Johnston's Title VII Claim

The district court held that HCFD violated § 704(a) of Title VII by retaliating against Johnston for his testimony at the Speed EEO hearing. HCFD advances several grounds for reversal, most of which merely assert that the district court's findings of fact are clearly erroneous. First, HCDF contends that one of the court's findings was clearly erroneous. This error, we are told, induced it to misapply the causation standard for Title VI cases, creating an error of law subject to plenary review. Second, the district court allegedly failed to appreciate the significance of Johnston's history of racial bias, an error that, again, caused the court to misapply the causation standard and subject itself to plenary review. Finally, HCFD maintains that one of the court's findings of fact defeats its finding that HCFD's justification for terminating Johnston was pretextual. On reviewing the record, in none of these instances are we left with a definite and firm conviction that the district court erred and, thus, we affirm. We now consider these contentions in detail.

Section 704(a) of Title VII provides that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). An employ-ee who sues under § 704(a) must prove a prima facie case of discrimination. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Once the employee has met his prima facie burden, the burden of production shifts to the employer, who must articulate a legitimate, nondiscriminatory justification for his action. *McDonnell Douglass Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668, 677 (1973); *Parker v. Mississippi State Department of Public Welfare*, 811 F.2d 925, 929 (5th Cir.1987). At this point, the factual inquiry proceeds to a new level of specificity, and the district court must decide whose explanation of the employer's motive it believes. *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed. 2d 403, 409–410 (1983); *Parson v. Kaiser Aluminum & Chemical Corp.*, 727 F.2d 473, 476 (5th Cir.), *cert. denied*, 467 U.S. 1243, 104 S.Ct. 3516, 82 L.Ed.2d 824 (1984).

> Ultimately, the employee must prove that there was a causal connection between the protected activity and the adverse employment decision. The connection required is causation-in-fact or "but for" causation. Whether or not there were other reasons for the employer's action, the employee will prevail only by proving that "but for" the protected activity she would not have been subjected to the action of which she claims.

*Jack v. Texaco Research Center*, 743 F.2d 1129, 1131 (5th Cir.1984). On appellate review of a fully tried case, we do not concern ourselves with the shifting burdens of proof that are relevant at trial. *Id.* Rather, we limit our review to the district court's finding on the ultimate question of discrimination *vel non. Parker*, 811 F.2d at 929 (citations omitted); *Parson*, 727 F.2d at 476 (citations omitted).

█ First, the district court made no clearly erroneous finding of fact that induced it to commit an error of law. Focusing on one phrase of one finding of fact, HCFD concludes that the entire finding of fact is clearly erroneous. HCFD argues that the district court premised its finding

of retaliation on one phrase of Finding of Fact No. 2: Johnston "performed his job with approximately the same level of proficiency of other HCFD employees at his level." According to HCFD, the record reveals serious, consistent problems with Johnston's job performance that render Finding of Fact No. 2 clearly erroneous.

When we read the phrase in context we cannot conclude that the district court committed clear error.

> [A] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. *United States v. United States Gypsum Co.* 333 U.S. 364, 395, 92 L.Ed. 746, 68 S.Ct. 525 [541] (1948) ...
>
> If the district court's account of the evidence is plausible in light of the record viewed *in its entirety,* the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be clearly erroneous.

*Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 528 (1985) (citations omitted) (emphasis added). Finding of Fact No. 2, in its entirety, states that "[a]lthough Plaintiff's job performance was in many ways deficient and/or problematic, Plaintiff performed his job with approximately the same level of proficiency as other HCFD employees at his level. Plaintiff was, generally, a loyal and competent employee of HCFD for over 30 years." The district court recognized that Johnston was not a model employee; it did not ignore the evidence of Johnston's difficulties with HCFD'S purchasing procedures or the evidence of employee complaints about Johnston's supervisory practices. Rather, the court concluded that Johnston was competent, albeit not perfect, a plausible view of

the evidence that we decline to disturb as clear error.[1]

■ Second, the district court did not underestimate Johnston's history of racial bias. HCFD contends that Johnston's problems with racial discrimination establish a legitimate, non-retaliatory justification for HCFD's actions and that the district court did not fully appreciate Johnston's racial tendencies. As a result, according to HCFD, the court again misapplied the "but for" standard of causation. When we read the district court's opinion in its entirety, we conclude that the court did not ignore or attempt to minimize Johnston's racial attitudes. In Finding of Fact No. 12 the court explained:

> Plaintiff, however, did have a long history of strained relations with minority employees and of favoritism toward certain employees, including Ms. Speed. In contrast, Defendants Green, Jordan, and Phipps had worked to improve employee relations at HCFD. Indeed, these Defendants exerted substantial efforts to cure employee dissatisfaction caused by Plaintiff's attitudes and policies, specifically Plaintiff's attitudes toward minority employees and favoritism toward certain employees.

In addition, the court accounted for Johnston's history of discrimination when it assessed damages, diminishing the punitive damage award in response Finding of Fact No. 12. A review of the entire record reveals that Johnston did engage in racially biased practices, that the court was aware of those practices, and that the court concluded that HCFD did not terminate Johnston because of those practices. As the district court's view of the evidence is plausible, we cannot find clear error.

■ Third, the district court did not defeat its own conclusions with its own findings of fact. Again, HCFD plucks from the district court's opinion one phrase of one finding of fact and scrutinizes it in the abstract, without reference to the opinion or the record as a whole. In Finding of

---

1. HCFD's contention that the court misapplied the causation standard rests on a conclusion that Finding of Fact No. 2 is clearly erroneous.

As we find no clear error, HCFD's analysis does not require us to review the district court's use of the causation standard.

Fact No. 12, the court found that Johnston had a history of strained relations with minorities *and* that HCFD had tried to cure the employee dissatisfaction that Johnston caused. According to HCFD, the finding that HCFD attempted to ease the racial tensions that Johnston caused defeats the court's finding of pretext. We disagree. Although HCFD may have tried to ease the tensions in its workforce, it tolerated Johnston's racial biases until it became convenient to find them intolerable. HCFD did not fire Johnston until he engaged in a practice that embarrassed HCFD, itself; HCFD cannot now hide behind its belated and feeble efforts to eliminate discrimination in the workplace in an effort to escape Title VII liability.

In a final challenge to its liability under Title VII, HCFD asserts that the result in this case condemns it to a position between the proverbial rock and hard place. As HCFD correctly explains, an employer is subject to Title VII liability for the discriminatory acts of its supervisory personnel. Had HCFD retained Johnston, it may have incurred liability to other employees for Johnston's discriminatory acts, a risk HCFD now is unwilling to bear. In this case, however, the district court found a Title VII violation when HCFD *fired* Johnston. Whether HCFD fired or retained Johnston, HCFD contends, Title VII liability was certain to arise. We express no opinion whether Johnston's racial biases would have provided permissible grounds for firing him or whether HCFD employees would have a colorable Title VII claim based on Johnston's racial biases. Neither of those cases is before us. In the case that is before us, an employer tolerated a supervisor whose racial attitudes and practices created difficulties in the workforce. When it became desirable to terminate the supervisor, his racial attitudes suddenly became intolerable. HCFD had accepted Johnston's attitudes and the liability risk they created for many years. The trial court could easily conclude that, having done so, HCFD cannot now cloak itself in principles of nondiscrimination—principles that it once chose to ignore—in an effort to shield itself from Title VII liability. We

affirm the district court's finding that HCFD violated § 704(a) of Title VII.

### 4. Johnston's § 1983 Claim

HCFD urges us to reverse the district court's award under § 1983, advancing two grounds for reversal, each without merit. First, HCFD insists that Johnston cannot pursue remedies under both Title VII and § 1983. Second, it maintains, even if Johnston may avail himself of both remedies, the First Amendment does not protect his testimony before the Commissioner's Court. We disagree on both counts and affirm the district court's award under § 1983.

### a. *The Relationship Between Title VII and § 1983*

Characterizing Johnston's claim as merely a claim for violation of § 704(a) of Title VII, HCFD maintains that Title VII preempts Johnston's § 1983 action. HCFD reminds us that Title VII provides the exclusive remedy for a violation of its own terms. Although HCFD's statement of the law is correct, it is incomplete. Title VII *is* the exclusive remedy for a violation of its own terms. But when a public employer's conduct violates both Title VII and a separate constitutional or statutory right, the injured employee may pursue a remedy under § 1983 as well as under Title VII. Moreover, HCFD misconstrues the nature of Johnston's § 1983 claim by assuming that retaliation for testimony at an EEO hearing violates only Title VII. HCFD's conduct was illegal for two reasons: it violated Title VII and it infringed Johnston's right to testify freely, one that is protected under the First Amendment, as we shall discuss. Because the predicate for Johnston's § 1983 claim was a right independent of the right Title VII creates, Johnston was entitled to pursue remedies under both statutes.

Section 1983 provides that any person who, under color of state law, deprives another of "any rights, privileges or immunities secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proper

proceeding for redress ...'' 42 U.S.C. § 1983. Rather than creating substantive rights, § 1983 simply provides a remedy for the rights that it designates. Thus, an underlying constitutional or statutory violation is a predicate to liability under § 1983. In *Irby v. Sullivan*, we held that Title VII is the exclusive remedy for a violation of the terms of Title VII. 737 F.2d 1418, 1428 (5th Cir.1984). Title VII *does* create rights secured by the laws of the United States, as § 1983 requires. Section 1983, however, is not an available remedy for deprivation of a statutory right when the statute, itself, provides an exclusive remedy for violations of its own terms. *Id.* (citing *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 28, 101 S.Ct. 1531, 1545, 67 L.Ed.2d 694 (1981); *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 19–20, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150 n. 5, 90 S.Ct. 1598, 1604 n. 5, 26 L.Ed.2d 142 (1970)). Consequently, a violation of § 704(a) of Title VII, alone, will not constitute an underlying statutory violation for purposes of imposing liability under § 1983. *Id.; accord, Day v. Wayne County Board of Auditors*, 749 F.2d 1199, 1205 (6th Cir.1984); *see also Great American Savings and Loan v. Novotny*, 442 U.S. 366, 377, 99 S.Ct. 2345, 2351, 60 L.Ed.2d 957, 967 (1979).

When a public employer's conduct violates both Title VII and a right secured by the constitution or by a statute, the boundary between areas of liability is not so neatly marked. Title VII is silent on the issue and the Supreme Court has yet to decide whether or to what extent Title VII and § 1983 provide overlapping remedies. The Court's efforts to reconcile Title VII with other statutory remedies do, however, inform our inquiry. In *Alexander v. Gardner–Denver, Co.*, the Court held that a private employee does not forfeit his remedy under Title VII if he also pursues an employment grievance under a collective bargaining agreement. 415 U.S. 36, 47–49, 94 S.Ct. 1011, 1019–20, 39 L.Ed.2d 147, 158 (1974). In reaching its conclusion the Court explained that ''legislative enact-ments in this area [employment discrimination] have long evinced a general intent to accord parallel or overlapping remedies against discrimination.'' *Id.*, 415 U.S. at 48, 94 S.Ct. at 1019, 39 L.Ed.2d at 158. As examples of remedies that parallel or overlap Title VII, the Court specifically referred to § 1983 and § 1981. *Id.* at 47 n. 7, 94 S.Ct. at 1019 n. 7, 39 L.Ed.2d at 158 n. 7. Finding that Title VII and § 1981 are ''separate, distinct and independent'' remedies, the Court has concluded that filing a Title VII claim does not toll the statute of limitations for a § 1981 action based on the same facts. *Johnson v. Railway Express Agency*, 421 U.S. 454, 461, 95 S.Ct. 1716, 1720, 44 L.Ed.2d 295, 302 (1975). As it discussed the relationship between Title VII and § 1981, the Court noted that ''despite Title VII's range and its design as a comprehensive solution for the problem of invidious discrimination in employment, the aggrieved individual clearly is not deprived of other remedies he possesses and is not limited to Title VII in his search for relief.'' *Id.* at 459, 95 S.Ct. at 1719, 44 L.Ed.2d at 301 (citations omitted). Rather, the legislative history of Title VII reveals that '' 'the remedies available to the individual under Title VII are co-extensive with the individual's right to sue under the provisions of the Civil Rights Act of 1866, 42 U.S.C. § 1981, and ... the two procedures augment each other and are not mutually exclusive.' '' *Id.*, at 459, 95 S.Ct. at 1720, 44 L.Ed.2d at 301. (quoting HR Rep. No. 92–238, p. 19 (1971)).

In contrast, the Court held in *Brown v. General Services Administration* that Title VII and § 1981 do not provide overlapping remedies for federal employees. 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976). Again, the Court delved into Title VII's legislative history, this time concluding that for federal employees Congress intended to create an ''exclusive, preemptive administrative and judicial scheme for the redress of employment discrimination.'' *Id.* at 829, 96 S.Ct. at 1966, 48 L.Ed.2d at 409. From *Alexander, Johnson* and *Brown* we can conclude that Title VII overlaps some, but not all, statutory remedies

for discriminatory employment practices. Moreover, the Court has instructed us, by example, to consult Congress's intentions to determine whether Title VII overlaps or preempts a public employee's cause of action under § 1983. *Keller v. Prince George's County,* 827 F.2d 952, 957 (4th Cir.1987).

As the Supreme Court has explained, the "legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes," including §§ 1983 and 1981. *See, Johnson,* 421 U.S. at 459, 95 S.Ct. at 1719, 44 L.Ed.2d at 301 (citation omitted); *Alexander,* 415 U.S. at 47–48 and n. 7, 94 S.Ct. at 1019 and n. 7, 39 L.Ed.2d at 158 and n. 7. In *Keller v. Prince George's County,* the Fourth Circuit held that Title VII does not preempt a state employee's remedy under § 1983 for employment practices that violate both Title VII and the Fourteenth Amendment. In reaching its conclusion, the court undertook a comprehensive review of the Title VII's legislative history. *Keller,* 827 F.2d at 958–62. In 1972, Congress amended Title VII to eliminate the exemption for state and local employers. *Id.* at 958 (citations omitted). As the bill travelled the arduous path through the House and the Senate, whether Title VII would be an exclusive remedy became a matter of intense debate. *Id.* at 958–60 (citations omitted). In its original form, the bill did not affect state and local employees' remedies under § 1983 or § 1981. *Id.* at 958 (citations omitted). After some debate, however, the House drafted a substitute bill, providing that Title VII was the exclusive remedy for discriminatory employment practices. *Id.* at 959 (citations omitted). When the Senate turned its attentions to the bill, it considered and rejected on three occasions proposals to make Title VII an exclusive remedy. *Id.* at 959–60 (citations omitted). The amendments to Title VII that Congress finally adopted did not create an exclusive remedy. *Id.* (citations omitted). Rather, "Congress ... reaffirmed the federal policy favoring a system of overlapping, and sometimes redundant, remedies ..." *Id.* at 960. As the

*Keller* court's detailed review of Title VII's legislative history reveals, Title VII supplements, rather than preempts, state and local employees' remedy under § 1983.

Our own decisions forshadowed today's holding. In *Nilsen v. City of Moss Point,* we discerned a general principle from *Johnson* and *Alexander:* use "of one procedural vehicle to vindicate a substantive right does not preclude employing a parallel procedural vehicle to vindicate the same substantive right." 701 F.2d 556, 561 (5th Cir.1983) (en banc). Thus, had the plaintiff in *Nilsen* advanced both her Title VII and her § 1983 claim in the same lawsuit, the court "would have had no choice but to adjudicate" both claims. *Id.* at 563. More important, by omitting to advance her § 1983 claim with her Title VII claim, the plaintiff forfeited her § 1983 action; the doctrine of res judicata barred her from asserting her § 1983 claim in a subsequent lawsuit arising from the same facts. *Id.* By requiring public employees to advance both their Title VII and their § 1983 claims in one suit we effectively recognized that Title VII does not preclude an action under § 1983 arising from the same facts.

When plaintiffs have invoked Title VII, § 1983 and § 1981 in the same lawsuit, we have noted that "[i]n this Circuit, specific consideration of these alternate remedies for employment discrimination [§§ 1983 and 1981] is necessary only if their violation can be made out on grounds different from those available under Title VII." *Parker,* 811 F.2d at 927 n. 3; *Parson,* 727 F.2d at 475 n. 1; *Page v. U.S. Industries,* 726 F.2d 1038, 1041 n. 2 (5th Cir.1984); *Carpenter v. Stephen F. Austin State University,* 706 F.2d 608, 612 n. 1 (5th Cir.1983); *Pegues v. Mississippi State Employment Service,* 699 F.2d 760, 762 n. 1 (5th Cir.), *cert. denied,* 464 U.S. 991, 104 S.Ct. 482, 78 L.Ed.2d 679 (1983); *Rivera v. City of Wichita Falls,* 665 F.2d 531, 534 n. 4 (5th Cir.1982). In each of these cases, we declined to consider the plaintiffs' § 1983 or § 1981 claims, instead resolving only their Title VII claims. We have rejected, however, any notion that this line of cases has redesigned Title VII to create an exclu-

sive remedy. In *Hernandez v. Hill Country Telephone Co–Op, Inc.*, we held that the cases do not stand for the proposition "that a claimant alleging racial discrimination in an employment setting is limited to recovery under Title VII." 849 F.2d 139, 142–43 (5th Cir.1988); *accord, Gonzalez v. Public Health Trust*, 686 F.Supp. 898 (S.D. Fla.1988).

Our interpretation of the relationship between Title VII and § 1983 does not disturb our holding in *Irby v. Sullivan.* Although Title VII supplements and overlaps § 1983, it remains an exclusive remedy when a state or local employer violates only Title VII. When, however, unlawful employment practices encroach, not only on rights created by Title VII, but also on rights that are independent of Title VII, Title VII ceases to be exclusive. At this point, § 1983 and Title VII overlap, providing supplemental remedies. All circuit courts that have had occasion to consider the issue have reached this same conclusion: *Ratliff v. City of Milwaukee*, 795 F.2d 612, 623 (7th Cir.1986); *Alexander v. Chicago Park District*, 773 F.2d 850, 855–56 (7th Cir.1985), *cert. denied*, 475 U.S. 1095, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986); *Trigg v. Fort Wayne Community Schools*, 766 F.2d 299, 301 (7th Cir.1985); *Day v. Wayne County Board of Auditors*, 749 F.2d 1199, 1204 (6th Cir.1984); *Owens v. Rush*, 654 F.2d 1370, 1380 & n. 12 (10th Cir.1981); *Vulcan Society of New York City Fire Department v. Civil Service Commission of New York*, 490 F.2d 387, 390 n. 1 (2d Cir.1973). Moreover, our conclusion is consistent with the Supreme Court's opinion in *Novotny*, where the Court distinguished employment practices that encroach on "two 'independent' rights" from those that violate only the rights created by Title VII. *Novotny*, 442 U.S. at 378, 99 S.Ct. at 2352, 60 L.Ed.2d at 967.

■ Because Johnston based his § 1983 action on a violation of an additional right that is independent of those falling under § 704(a) of Title VII, the district court correctly found HCFD liable under both § 1983 and Title VII. Johnston alleged and established that HCFD's conduct violated two independent rights: Johnston's right under Title VII to be free from retaliation for testifying at an EEO hearing *and* his right under the First Amendment to testify freely before the Commissioner's Court. HCFD insists that Johnston's action constitutes only a claim for unlawful retaliation under Title VII, an interpretation that ignores the rights to which Johnston was entitled when he testified. Under Title VII, Johnston was entitled to testify in the EEO proceeding without suffering an adverse employment action. Johnston's First Amendment rights are similar to his Title VII rights, but are independent of Title VII. The First Amendment, as we explain below, guarantees Johnston's right to testify fully and truthfully before the Commissioner's Court. When HCFD retaliated against Johnston for exercising that right, it infringed a right that is independent of Title VII. Thus, the court properly imposed liability on HCFD both under Title VII and under § 1983.

b. *Johnston's Testimony As Protected Speech*

■ HCFD contends that, even if Johnston may pursue remedies both under Title VII and under § 1983, Johnston's testimony before the Commissioner's Court will not support a § 1983 action based on a violation of the First Amendment. According to HCFD, Johnston's testimony is not protected speech and, thus, HCFD's retaliatory action did not violate a right guaranteed by the constitution, as § 1983 requires. Describing Johnston's speech as "testimony under oath in a proceeding before the Harris County Commissioner's Court," the district court held that the speech was protected by the First Amendment. HCFD filed a motion for a new trial on the § 1983 claim, asserting that the speech is not protected. In denying HCFD's motion, the district court explained its original ruling: Johnston's "speech was protected under the First Amendment not merely for its content but also due to the context in which it was given: testimony as a witness before a government fact-finding body hearing an official matter." On ap-

peal, HCFD clings to its assertion that Johnston's speech is not protected. HCFD describes the Speed EEO hearing as a closed meeting of the Harris County Commissioners Court convened to review an issue of intragovernment concern involving only one employee. Johnston appeared at the hearing in his capacity as an individual employee, addressing only a personnel dispute between HCFD and Speed. We conclude that Johnston's testimony was protected speech and affirm.

A state may not condition public employment on grounds that infringe on its employees' constitutionally protected right to freedom of expression. *Rankin v. McPherson*, 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315, 324 (1987); *Connick v. Myers*, 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708, 716–17 (1983); *Page v. DeLaune*, 837 F.2d 233, 237 (5th Cir.1988). Determining whether a public employer has discharged an employee in violation of the First Amendment requires us to weigh competing interests; we balance the employee's interest, as a citizen, in commenting on issues of public concern against the state's interest, as an employer, in "promoting the efficiency of the public services it performs through its employees." *Rankin*, 483 U.S. at 384, 107 S.Ct. at 2896, 97 L.Ed.2d at 324. As we strike this balance, our threshold inquiry is whether the employee's speech addressed a matter of public concern. *Id.*, 483 U.S. at 384, 107 S.Ct. at 2896, 97 L.Ed.2d at 324; *Connick*, 461 U.S. at 146, 103 S.Ct. at 1689, 75 L.Ed.2d at 719; *Page*, 837 F.2d at 237; *Brinkmeyer v. Thrall Independent School District*, 786 F.2d 1291, 1294 (5th Cir. 1986).[2] We do not review the employee's words in a vacuum. Rather, we decide whether speech addresses a matter of public concern with reference to the "content, form and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48, 103 S.Ct. at 1690, 75

L.Ed.2d at 720. The issue is one of law that we decide independently on appeal. *Rankin*, 483 U.S. at 386 & n. 9, 107 S.Ct. at 2897 & n. 9, 97 L.Ed.2d at 325 & n. 9; *Gonzales v. Benavides*, 774 F.2d 1295, 1300 (5th Cir.1985), *cert. denied*, 475 U.S. 1140, 106 S.Ct. 1789, 90 L.Ed.2d 335 (1986).

■ Johnston's testimony at the EEO hearing meets the public concern requirement. HCFD's description of Johnston's testimony is correct: Johnston testified about a personnel dispute between HCFD and one of its employees. In contrast, HCFD's conclusion that the testimony was not of public concern is incorrect, for HCFD ignores the context in which Johnston spoke. As a general rule, when a public employee speaks about matters that are of personal interest only, the speech does not address matters of public concern. *Connick*, 461 U.S. at 147, 103 S.Ct. at 1690, 75 L.Ed.2d at 720. Under certain circumstances, however, the context in which the employee speaks may be sufficient to elevate the speech to the level of public concern. For example, in *Rankin*, the content of employee's statement, alone, did not convey any thoughts of interest or concern to the public at large. Yet the Court held that the speech addressed a matter of public concern, stressing the context of the speech. *Rankin*, 483 U.S. at 386–87, 107 S.Ct. 2897–98, 97 L.Ed.2d at 325–26. The employee, so the Court holds, made a statement in the midst of a conversation about the policies of a presidential administration, a discussion that followed a news bulletin about a matter of heightened public attention. *Id.*, at 386, 107 S.Ct. at 2398, 97 L.Ed.2d at 325–26. The political context in which the employee spoke was sufficient, said the Court, to elevate the speech to a matter of public concern—although it was in form a puerile expression of hope that the President of her country would be murdered.

---

**2.** If the employee's claim survives our initial inquiry, we examine two additional questions: first, whether the employee's speech was a substantial factor in the employer's adverse employment decision and, second, whether the employer's interest in promoting the efficiency of its public services outweighs the employee's interest in freedom of expression. *Rankin*, 483 U.S. at 388, 107 S.Ct. at 2898, 97 L.Ed.2d at 326; *Page*, 837 F.2d at 237. As HCFD contends only that Johnston's speech did not address an issue of public concern, we need not address these two additional questions.

When an employee testifies before an official government adjudicatory or fact-finding body he speaks in a context that is inherently of public concern. "Our judicial system is designed to resolve disputes, to right wrongs. We encourage uninhibited testimony, under penalty of perjury, in an attempt to arrive at the truth." *Reeves v. Claiborne County Board of Education,* 828 F.2d 1096, 1100 (5th Cir.1987). We would compromise the integrity of the judicial process if we tolerated state retaliation for testimony that is damaging to the state. If employers were free to retaliate against employees who provide truthful, but damaging, testimony about their employers, they would force the employees to make a difficult choice. Employees either could testify truthfully and lose their jobs or could lie to the tribunal and protect their job security. Those able to risk job security would suffer state-sponsored retaliation for speaking the truth before a body entrusted with the task of discovering the truth. *See Smith v. Hightower,* 693 F.2d 359, 368 (5th Cir.1982). Those unwilling or unable to risk unemployment would scuttle our efforts to arrive at the truth. *Reeves,* 828 F.2d at 1100. Thus, a grand jury witness speaks on matters of public concern when he furnishes truthful information to the grand jury on a matter that the grand jury properly is investigating. *Neubauer v. City of McAllen,* 766 F.2d 1567, 1572–73 n. 5 (5th Cir.1985). Likewise, when one state employee testifies in another employee's civil action against their mutual state employer, the witness's testimony constitutes a matter of public concern for First Amendment purposes. *Reeves,* 828 F.2d at 1100–1101. *See also Smith,* 693 F.2d at 368 (holding that the First Amendment protects a witness's right to testify truthfully at a criminal trial.) The goal of grand jury proceedings, of criminal trials, and of civil trials is to resolve a dispute by gathering the facts and arriving at the truth, a goal sufficiently important to render testimony given in these contexts speech "of public concern."

Like testimony before a grand jury and before a district court, Johnston's testimony before the Harris County Commissioner's Court constitutes speech on a matter of public concern. The Commissioner's Court was acting, as the district court explained, as fact finding body hearing an official matter. The purpose of the hearing was to resolve Marilon Speed's employment dispute by gathering testimony and arriving at the truth. The Commissioner's Court, like the grand jury and the district court, has an important interest in the integrity of its fact finding process. If we were to permit HCFD to retaliate against employees who testify before the Commissioner's Court, we would chill the employees' willingness to testify freely and truthfully and would obstruct the Commissioner's Court's path to the truth. Given the context in which Johnston spoke, his testimony constitutes speech on a matter of public concern and, thus, was entitled to First Amendment protection. As the speech is protected, it properly formed the basis of Johnston's § 1983 action.

5. Damages

a. *Johnston's Duty To Mitigate His Damages*

As Johnston failed to mitigate his damages, the district court erred when it did not reduce Johnston's back pay award in relation to the period in which he did not seek other employment. A successful Title VII plaintiff is entitled to back pay, subject to a statutory duty to minimize his damages. *Ford Motor Co. v. E.E.O.C.,* 458 U.S. 219, 231–32, 102 S.Ct. 3057, 3065–66, 73 L.Ed.2d 721 (1982); 42 U.S.C. § 2000e–5(g). This duty to mitigate required Johnston to use reasonable diligence in finding other, suitable employment. *Ford Motor Co.,* 458 U.S. at 231, 102 S.Ct. at 3065, 73 L.Ed.2d at 732; *Floca v. Homecare Health Services, Inc.,* 845 F.2d 108, 111 (5th Cir.1988) (citation omitted). It is undisputed that after a certain time Johnston simply stopped looking for another job. Johnston described his job search at trial:

Q. Had you tried to get a job, by the way?

A. I talked to one man about some security work that was at that Mobay

Plant on Sheldon Road there, hadn't even filled out an application because after I talked to him he told me that I didn't have enough education to handle it; and they wouldn't let me go out there on account I just had one eye; and I never went out. . . .

Q. Is that what discouraged you from looking further?

A. Yes, it did. I never looked any more.[3]

After this initial inquiry, Johnston did not try to obtain other employment and, thus, did not fulfill his duty to exercise reasonable diligence to mitigate his damages. Accordingly, we reverse the district court's award of back pay and remand with instructions to reduce the award commensurate with the time Johnston was not seeking other employment.

b. *Accounting For Tax Liability In The Damage Award*

When the district court recalculates Johnston's damages on remand, it also should clarify whether its award constitutes a personal injury-like award under § 1983 or a back pay award under Title VII. The district court found that Johnston's actual damages included lost wages, employment benefits, and pension benefits, for a total of $142,071 in actual damages. Noting that HCFD was liable under § 1983, the court fixed Johnston's actual damages for that cause of action at $142,071. Likewise, the court noted that HCFD incurred liability under Title VII and that Johnston's actual damages under Title VII also were $142,071. As Johnston was entitled to only one recovery, the court entered judgment againt HCFD for $142,071 for all of Johnston's claims. The distinction between the § 1983 award and the Title VII award is important for federal income tax purposes.

Although the court did not expressly adopt Johnston's method of calculating damages, the sum that the court awarded is the exact sum that Johnston calculated in his brief on damages. Johnston's expert on damages appears to have assumed that the award would be a back pay award. He computed the amount of back pay and future pension and benefit payments due to Johnston for each year and deducted the amount of federal income taxes due for each year. HCFD's expert also computed the amount of back pay and future pension and benefit payments due each year. When HCFD's expert accounted for federal income taxes, he added the amount of back wages owed to Johnston for each year to the amount Johnston actually received as income for each of those years, thus elevating Johnston to a higher tax bracket for the years in which he is entitled to back pay. Each party contends that its approach to the tax and damages question is correct. Neither party is entirely correct; whether the court's award properly accounts for Johnston's tax liability depends on the nature of the award.

■ Damages received "on account of personal injuries or sickness" are exempt from federal income tax. 26 U.S.C. § 104(a)(2). Damages fall into § 104(a)(2)'s exemption if the plaintiff receives them through prosecution or settlement of an action based on "tort or tort-type rights." Income Tax Regs., § 1.104–1(c), 26 C.F.R. § 1.104–1(c). Relying on the Supreme Court's analogies between § 1983 and tort actions, the Third Circuit and the Tax Court have concluded that § 1983 is an action based on a "tort or tort-type" right.

---

**3.** Feeling that a job search would be futile, Johnston explained "I don't feel like a man that's 59 years old and has had one lung and emphysema and bronchial trouble, just one eye, and not much education that there's not much need in me looking for a job." We express no opinion whether Johnston's understandable doubts about his employment prospects would have proved valid had he actually searched for a job. Nor do we consider whether Johnston could have obtained a position comparable to the one he attained after 30 years experience with HCFD. Certainly, Title VII's mitigation requirement does not mandate that plaintiffs "go into another line of work, accept a demotion or take a demeaning position." *Ford Motor Co.*, 458 U.S. at 231, 102 S.Ct. at 3065, 73 L.Ed.2d at 732. If, however, a claimant makes no effort to obtain any type of employment, we need not consider, in the abstract, whether a comparable job would have become available.

*Bent v. Commissioner of Internal Revenue*, 835 F.2d 67, 70 (3d Cir.1987); *Metzger v. Commissioner of Internal Revenue*, 88 T.C. 834 (1987), *aff'd without op.*, 845 F.2d 1013 (3d Cir.1988). As a result, damages awarded under § 1983 are tax-free. *Bent*, 835 F.2d at 70; *Metzger*, 88 T.C. at 858. The award remains exempt even if the court considered lost earnings as an element of damages in a § 1983 action. *Bent*, 835 F.2d at 70. On the other hand, damages that constitute a back pay award under Title VII are not exempt under § 104(a)(2). *Hodge v. Commissioner of Internal Revenue*, 64 T.C. 616 (1975). At least for purposes of FICA (Social Security) taxes, a plaintiff receiving a back pay award is liable for the taxes that would have accrued in the year the wages were due. *Bowman v. United States*, 824 F.2d 528, 530 (6th Cir.1987).

█ The tax-free nature of a damage award determines whether and how a district court should account for tax liability when it computes the award. Because they are tax-free, personal injury awards based on lost earnings "ideally" should reflect the plaintiff's after-tax wages and benefits. *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 534, 103 S.Ct. 2541, 2549, 76 L.Ed.2d 768, 787 (1983) (citation omitted). A personal injury award that accounts for the plaintiff's tax liability accurately reflects the amount that the plaintiff actually lost. An award that does not account for tax liability would grant a windfall to the plaintiff; he would receive, tax-free, an amount normally subject to taxes. When the court accounts for the tax liability, it may, as the district court did here, compute the taxes due on the wages that form the basis of the award. The court need not examine the plaintiff's actual income and speculate as to his actual tax liability after the back pay award is added to the actual income. The purpose of accounting for taxes is not to arrive at a precise determination of the plaintiff's tax liability; it is to account for factors that may reduce the plaintiff's actual loss. Absolute precision is not necessary. Thus, if the court concludes that its award is one

under § 1983, it correctly accounted for Johnston's tax liability.

In contrast, the court need not account for federal income tax liability when it fixes back pay awards. *Rasimas v. Michigan Department of Mental Health*, 714 F.2d 614, 627 (6th Cir.1983), *cert. denied*, 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984); *Curl v. Reavis*, 608 F.Supp. 1265, 1269 (W.D.N.C.1985). The award is not tax-exempt; the plaintiff must pay the taxes due on the wages for the year in which the wages were due. We decline to require district courts to act as tax consultants every time they grant back pay awards, speculating as to what deductions and shelters the plaintiff will find, and then calculating the plaintiff's potential tax liability. *See Curl*, 608 F.Supp. at 1269. If the district court finds that its award is purely back pay, then it must recalculate the award, eliminating any reduction for federal income tax liability.

### c. *Use Of Statistical Life Expectancy Tables To Calculate Damages*

█ The district court did not err when it based its damage award on statistical life expectancy tables. In general, statistical life expectancy is the basis for our damage computations. As we explained in *Madore v. Ingram Tank Ships:*

> The phrase "work-life expectancy" literally reflects its meaning: the average number of years that a person of a certain age will both live and work. Such an average is not conclusive. It may be shown by evidence that a particular person, by virtue of his health or occupation or other factors, is likely to live and work a longer, or shorter, period than the average. Absent such evidence, however, computations should be based on the statistical average.

732 F.2d 475, 478 (5th Cir.1984) (citations omitted). HCFD has not provided us sufficient evidence to warrant departure from the statistical averages. Dr. Huddle, Johnston's expert witness, based his damage calculations on standard life expectancy tables. HCFD relies on a brief, conclusory statement by Dr. Friedman, HCFD's medi-

cal expert, to conclude that Dr. Huddle should not have relied on statistical averages. When asked his opinion on Johnston's life expectancy, Dr. Friedman replied "[i]t's difficult to say. He, between 1971 and 1984, has shown significant decrease in his breathing capacity. I would—because he also has heart disease as well, I would think that his life expectancy might be eight to ten years." Dr. Friedman neither based his projection on reasoned analysis of Johnston's actual conditions, nor provided the court with any firm evidence as to how or to what extent Johnston's health would diminish his life expectancy. Dr. Friedman's testimony amounts to an off-the-cuff estimate rather than an opinion based on a careful analysis of the facts of the case. Dr. Hill, HCFD's economic expert, merely adopted Dr. Friedman's conclusion without examining independently any facts that would render the statistical averages inappropriate.

Moreover, Dr. Friedman's own testimony belies his conclusion. Most men suffering Johnston's medical condition may well have a life expectancy that is less than the statistical average. Dr. Friedman testified that Johnston was totally disabled by 1971, but had continued to work until 1984, a "valiant effort" that most men in Johnston's condition would not be capable of making. For 13 years Johnston exceeded medical expectations of his ability to work; we cannot conclude, on the basis of Dr. Friedman's conclusory statement, that Johnston will cease to do so. We express no opinion on what would be a reasonable medical estimate of Johnston's life expectancy. We simply hold that Dr. Freidman and Dr. Hill's testimony does not provide us with a reasoned basis for departing from the statistical averages that Dr. Huddle and the district court used.

### d. *Social Security Benefits*

■ The district court did not err by refusing to deduct from Johnston's back pay award the amount that he received in social security disability benefits. The de-

cision whether to deduct unemployment compensation benefits from a back pay award is left to the trial court's discretion. *Johnson v. Chapel Hill Independent School District,* 853 F.2d 375, 382 (5th Cir.1988). We conclude that the district court also may exercise its discretion in deciding whether to deduct social security disability benefits from back pay awards. HCFD offers no reason why the district court abused its discretion in this case and we find none in our own review of the record.

### 6. The District Court's Award Of Attorney's Fees

■ HCFD raises a myriad of challenges to the award of attorneys fees, most of which ignore the district court's careful scrutiny of the fee application as well as the court's findings of fact. For convenience, we group HCFD's complaints about the award into four areas: the court's refusal to exclude 1.) time for issues that Johnston dismissed before trial; 2.) time that purportedly reflects a duplication of effort; 3.) attorney time that was more properly paralegal time; and 4.) time that was excessive. Reviewing each contention in turn, we hold that the court neither abused its discretion nor based its award on any clearly erroneous findings of fact. We affirm the court's award of attorneys fees in the amount of $134,021.15.[4]

Recognizing the "district court's superior understanding of the litigation," we have committed the award of attorneys fees to its discretion. *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed. 2d 40, 53 (1983); *Leroy v. City of Houston,* 831 F.2d 576, 584 (5th Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1735, 100 L.Ed.2d 199 (1988); *Curtis v. Bill Hanna Ford, Inc.,* 822 F.2d 549, 551 (5th Cir.1987) (citations omitted). Thus, we will disturb the court's total award of attorney's fees only if the court abused its discretion. *Leroy,* 831 F.2d at 584; *Curtis,* 822 F.2d at 551. We review the facts underlying the

---

**4.** The court also awarded $10,861.58 in costs, an award that HCFD does not contest on appeal and that we do not disturb.

court's calculation of the award by the clearly erroneous standard. *Leroy,* 831 F.2d at 584; *Curtis,* 822 F.2d at 551. With these principles in mind, we turn to each of HCFD's challenges to the fee award.

The district court's award does not improperly compensate Johnston's attorneys for time that they spent on issues that were dismissed before trial or that proved fruitless. HCFD points out that Johnston's age and handicap discrimination claims were dismissed before trial, as were his state claims. As a result, HCFD urges us to exclude the time that Johnston's attorneys spent in pursuit of the unsuccessful claims. When an attorneys fee applicant has prevailed on some, but not all, of his claims, we consider "whether the plaintiff prevailed on the central issue by acquiring the primary relief sought." *Texas State Teachers Association v. Garland Independent School Dist.,* 837 F.2d 190, 192 (5th Cir.1988), *cert. granted,* — U.S. —, 109 S.Ct. 51, 102 L.Ed.2d 30 (1988). Even if the plaintiff prevailed on his central issue, acquiring primary relief, he is not entitled to attorneys fees for time spent pursuing claims that are distinctly different from the central, successful claim. *Hensley,* 461 U.S. at 442, 103 S.Ct. at 1944, 76 L.Ed.2d at 56. In this case, the court did not err when it declined to exclude time that Johnston's attorneys spent in pursuit of claims that eventually were dismissed. The court found that

> [Johnston's] counsel expended an enormous amount of time on the case, however, the results were excellent. . . . [W]hile [Johnston] did not recover on his age and handicap claims, it was defendants who injected fact issues on [Johnston's] age and infirmity into the case. . . . The court found that any reliance by defendants on plaintiff's age or infirmity in their treatment of plaintiff was pretextual only. . . . Nonetheless, [Johnston's] attorneys cannot be faulted for addressing issues raised by defendants. Furthermore, as issues of age and infirmity were part of defendants' articulated reason for terminating [Johnston], these issues are integrally bound up with [his] retaliation claims.

HCFD offers no reason why this finding is clearly erroneous and we find none on our review of the record.

■ Likewise, the court's finding that Johnston's attorneys did not unduly duplicate attorney time is not clearly erroneous. The court made a specific finding of fact on this issue, noting that "there was no undue duplication of effort among [Johnston's] attorneys." HCFD advances two reasons why the court's award includes time for duplicated efforts, but fails to establish clear error. First, HCFD maintains that the court's decision to accept all of the hours that Johnston's counsel submitted evinces a failure to scrutinize the records for duplicitous time. Contrary to HCFD's allegations, the court did not accept without question all of the time that Johnston's attorneys submitted. Attorney Colton failed to itemize his time, to submit a supplemental affidavit or to attend the fee hearing. Accordingly, the district court refused to award Attorney Colton any of the fees he requested. Moreover, even if the court had accepted every moment of the attorneys' requested time, we could not conclude that its finding of fact was clearly erroneous without some indication in the record that Johnston's attorneys did duplicate their time. HCFD makes no such showing. We decline to conclude that accepting as reasonable all of the time an attorney has submitted automatically renders the court's finding clearly erroneous.

Second, HCFD contends, again without merit, that two of the attorneys' methods for staffing the case necessarily resulted in duplication. HCFD finds duplication in the number of plaintiff's attorneys who attended the trial. According to HCFD, three attorneys attended each day of trial but only two attorneys actually participated in the trial. HCFD does not explain what the third attorney did during the trial, nor does it suggest that the third attorney made no contribution to the trial team's efforts or that he did the same work that the other two attorneys did. HCFD also complains about the allocation of attorney time for depositions and trial testimony. For six witnesses, one of Johnston's attorneys con-

ducted the pretrial deposition but another examined the witness at trial. Without pointing to any efforts that the attorneys actually duplicated, HCFD asserts that this practice necessarily resulted in duplicated efforts. Again, we decline to find that the court committed clear error without some indication from the record that the attorneys duplicated their time. Overall, the record indicates that Johnston's attorneys made admirable efforts to minimize the cost of this litigation. The court found that the attorneys left much of the pretrial preparation to young, and thus less expensive, attorneys and that they delegated legal research and paralegal work to law clerks—both practices that minimized the cost of pursuing Johnston's claim.

Next, the district court did not improperly compensate Johnston's attorneys for work that they should have delegated to a paralegal. On review of a fee application, the district court must consider "whether the work performed was 'legal work in the strict sense' or was merely clerical work that happened to be performed by a lawyer." *Abrams v. Baylor College of Medicine*, 805 F.2d 528, 536 (5th Cir.1986) (quoting *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717 (5th Cir.1974)). The district court found that "all hours claimed as attorney hours are for legal work. Plaintiff's attorneys did not seek attorney's fees for clerical-type work. Though some of the work done by plaintiff's attorneys arguably could have been done by paralegals, the fact that this work was done by the attorneys will not diminish the fee award as their efforts enhanced their trial preparation." HCFD finds only one example of time better spent by a paralegal: several hours that Attorney Mladenka–Fowler spent annotating a deposition. We cannot conclude that the court committed clear error when it found that this type of activity contributed to the attorney's trial preparation.

Finally, HCFD's complaint that the court awarded fees for an excessive amount of time is without merit. The court reviewed each attorney's time and, with the exception of Attorney Colton's time, found that the time was reasonable. The court then reviewed the fee request under the 12 factors that we set forth in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 718–19 (5th Cir.1974). HCFD raises two primary objections to the hours expended. First, HCFD's expert on attorneys fees spent more time reviewing the record than Johnston's expert spent. Presumably, HCFD would have us conclude that its expert is more credible than Johnston's. The district court, however, found otherwise, explaining that "[Johnston's] expert on attorney's fees, a well-known civil rights attorney, testified [Johnston's] attorney's fees were reasonable and in accordance with fees awarded in similar cases. Defendant's expert objected to this conclusion, however, [Johnston's] expert was an attorney of far greater experience in these matters and the court gives his opinion the greater weight as to this factor." The mere fact that it took one expert longer than another to form an opinion does not render one opinion inherently more credible than the other. We are reluctant to disturb as clearly erroneous a finding of fact that the district court based on the credibility of the witnesses.

■ Second, HCFD characterizes the case as a single plaintiff case that did not raise any complicated issues of law and, thus, did not warrant an extensive investment of attorney time. HCFD again has ignored the district court's findings. The court concluded that Johnston's Title VII and § 1983 claims were straight-forward, but that several other factors complicated the lawsuit. Moreover, as Johnston points out, HCFD contributed to the length and complexity of the case by engaging in delaying tactics during discovery and by advancing repeated motions to disqualify counsel. The court's finding that the hours were reasonable is not clearly erroneous.[5]

---

5. HCFD also raised two picayune issues. First, it points out that one attorney's time sheet for one day includes 31.5 hours, a superhuman feat—or perhaps a clerical error. HCFD failed

to present this billing problem to the district court and we decline to make an independent review of it on appeal. Second, HCFD contends that Attorney Acosta's time is excessive because

Having reviewed each of HCFD's many claims of error, we affirm all of the district court's findings and conclusions except for its computation of damages. Accordingly, we AFFIRM in part and REVERSE in part, remanding for a recalculation of the damages award.

she did not verify her own time sheets. Certainly, we do not condone the practice of submitting time sheets when the attorney who expended the time has not reviewed them for accuracy. The district court, however, was aware that Attorney Nelson verified Attorney Acosta's time sheets and the court did not consider them unreliable; we decline to do so on appeal.