**Patrice SHARP, Plaintiff,**

**v.**

**The CITY OF HOUSTON, et al., Defendants.**

**Civil Action No. H–94–4168.**

United States District Court, S.D. Texas, Houston Division.

March 11, 1997.

Katherine Louise Butler, Butler & Harris, Houston, TX, for Plaintiff.

City of Houston-Brian J. Begle, Houston City Attorney's Office, Edgar Bice & Wayne Hankins-Richard H. Cobb, Houston, TX, for Defendants.

## MEMORANDUM AND ORDER

CRONE, United States Magistrate Judge.

Pending before the court is Defendants City of Houston ("the City"), Dale Brown ("Brown"), Dennis Storemski ("Storemski") and Sam Nuchia's ("Nuchia") Motion for Summary Judgment (# 38). These defendants seek summary judgment on Plaintiff Patrice Sharp's ("Sharp") claims of sexual discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII")

and on her claim of "pervasive departmental misconduct" under 42 U.S.C. § 1983. Two additional defendants, Sergeant Edgar Bice ("Bice") and Lieutenant Wayne Hankins ("Hankins"), have not moved for summary judgment.

Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, this court is of the opinion that the motion for summary judgment should be granted in part and denied in part.

## I. *Background*

In August 1989, Sharp, an officer with the Houston Police Department ("HPD") since 1986, was assigned to the Mounted Patrol Unit. Sharp alleges that not long thereafter, she began to be subjected to frequent sexual harassment by her immediate supervisor, Bice, and later by Bice's supervisor, Hankins. Sharp contends that although Bice began harassing her in 1989, the most egregious incidents occurred after Hankins became the head of the Mounted Patrol Unit in 1991. Sharp maintains that Bice's previous lieutenant had kept Bice's behavior in check to some degree, but when Hankins took over, Hankins joined Bice as a perpetrator.

According to Sharp, Hankins would regularly tell crude and offensive jokes during morning roll calls, which were normally attended by the officers at the beginning of the day. The fact that offensive jokes were told is corroborated by the statements of Hankins and Officer Raymond Smith, an officer with the K–9 trailing detail, and the deposition testimony of Officer Mark Montgomery ("Montgomery"). Montgomery also reported the following incident:

> I was present at a Mounted Patrol roll call when Lt. Hankins walked in and walked up to Officer Sharp. I observed Officer Sharp sitting in a chair in the roll call room. I observed Lt. Hankins walk up to her and make some remark about oral sex and unzip his pants with his crotch directly in front of Officer Sharp's face. I observed Lt. Hankins make a joke about the encounter and laugh.

According to another witness to the incident, Sergeant J.W. Brown ("Sgt.Brown"), Hankins had his crotch within approximately eight inches of Sharp's face.

Sharp maintains that on an least two other occasions, Hankins responded to job-related inquiries from Sharp "by grabbing his crotch and saying 'take care of this' and 'chew on this.'" Sharp also maintains that Hankins often screamed profanities at her. On one occasion, according to Sharp, she requested compensatory time off rather than paid overtime, which precipitated Hankins's screaming at her, liberally making use of the "F-word." Sharp maintains that male officers had requested and received compensatory time off from Hankins without incident. Sharp also alleges that on several occasions, Hankins yelled at her and her partner, Monica Johnson ("Johnson"), from his vehicle that he had caught them "fucking off" again. Additionally, Sharp asserts that at the Republican National Convention ("RNC") in the summer of 1992, Hankins "dropped his pants to display his underwear in front of several officers, including Officer Sharp." On another occasion, according to Sharp, she and Officer Chuck Kennedy ("Kennedy") drove into the parking lot of the Mounted Patrol stables and witnessed Hankins urinating off of the porch of the Mounted Patrol office. This incident was purportedly witnessed by Bice, Sgt. Brown, Officer Fred Highland, as well as Sharp and Kennedy. Sharp *maintains* that Kennedy denied witnessing the incident and even being present in the patrol car with Sharp that day.

Bice's behavior, according to Sharp, grew worse under Hankins's supervision. According to Montgomery, Bice would refer to Sharp's breasts as "headlights." If Sharp bent over to pick something up, he would say "hold that position, gal," swiveling his hips to simulate sexual intercourse. Bice also allegedly made a comment that Sharp should enter a wet T-shirt contest. Bice purportedly made such comments not only in private but often in front of other police officers, which was corroborated by Mary Alice Jones ("Jones"), a secretary at Mounted Patrol. According to Jones, Bice's supervisor, Hankins, would never express disapproval of Bice's conduct when he observed such behavior. On one occasion, according to Sharp, Bice sat on her lap in front of Jones. Sharp

maintains that Bice would make suggestive comments to her and leer offensively. Johnson's statement corroborates Sharp's assertion that Bice once jokingly referred to Sharp, Johnson, and himself as being in a "sandwich," taken by Sharp and Johnson to mean a "sexual threesome." According to Sharp, if she "sought his permission to deal with personal matters such as vacation time, child-care related issues, and compensatory time, Sgt. Bice often remarked in response that he had keys to a hotel room and they could go there to 'discuss it.'" He also allegedly made the frequent remark that "the couch in his office made into a bed, suggesting that she use it, and raising his eyebrows in an ogling manner." In June 1993, Bice allegedly reacted to Sharp's request for vacation time by saying that he would only approve it if she brought him a picture of herself on a nude beach. Sharp maintains that Sergeant Russell Chapman ("Chapman") witnessed this incident.

Sharp alleges that in early 1993, Bice "crept up behind her, put his hands on her shoulder and kissed her in her right ear." This incident was witnessed by Jones. Sharp maintains that Johnny Sessums also witnessed the incident. Sharp contends that "this was particularly disturbing because it indicated to Officer Sharp that the harassment was now at a new level-Sgt. Bice was now a physical threat and Officer Sharp was afraid to be alone with him." Not long after this incident, Sharp approached Sgt. Brown, another sergeant assigned to the Mounted Patrol Unit, allegedly in confidence due to fear of retaliation, to discuss her situation and inquire about the possibility of transferring to his squad. The deposition testimony of Johnson corroborates the assertion that she accompanied Sharp to request Sgt. Brown's help with a transfer for both of them. According to Sharp's declaration, she would not have to be "in direct contact" with Bice if she was transferred into Sgt. Brown's squad. Sgt. Brown later convinced Sharp that he needed to tell Hankins of Bice's misconduct and assured her that he would try to effect the transfer. According to Sharp's declaration, Sgt. Brown told Sharp that he had spoken to Hankins in February 1993, "but the harassment did not stop, and we were not transferred into Sergeant Brown's squad until after Officer Abel Devora's ('Devora') complaint approximately five months later."

In July 1993, Sergeant J.R. Dziedzic ("Dziedzic"), a sergeant in the same division, initiated an inquiry into practices at Mounted Patrol. The inquiry was instigated as the result of a complaint by Devora, who believed that his transfer from Mounted Patrol was motivated by racism. Sharp purportedly was quite reluctant to discuss with Dziedzic whether sexual harassment had occurred in the squad, as she had observed Bice reading the "supposedly confidential" statements given by other officers. Sharp alleges that "[s]ince Dziedzic had not even taken steps to protect the confidentiality of statements, she knew that her fellow officers would not report the truth." Sharp was also apparently mindful of the possibility of retaliation from Bice and Hankins, because Bice had allegedly told Sharp that "he would get rid of her if she ever crossed him." Additionally, Sharp maintains that other women officers had complained about mistreatment, which only resulted in them being given the label "bitch."

Bice acknowledges discussing the pending investigation into Mounted Patrol's practices in roll call and saying, "Get your story and stick with it," or words to that effect. Bice also allegedly told other officers that Sharp was under investigation, which was incorrect. According to Sharp, at that point, she brought her complaints to the attention of the Internal Affairs Division ("IAD") of the HPD.

Sharp makes numerous allegations relating to improprieties in the way the investigation was handled. For example, in her complaint, she alleges:

23. The department's written procedures require that a complaint of violation of federal or state law-which Officer Devora's complaint certainly contained-be investigated by the Internal Affairs Division.... Despite this policy, the matter was not initially referred to the Internal Affairs Division. Instead, Assistant Chief Dennis Storemski and Captain Dale Brown inten-

tionally circumvented departmental orders in performing an "internal inquiry" of the matter.

24. When Lt. Terry Coilman of the Internal Affairs Division learned of the allegations included in Mr. Devora's complaint, he concluded that this was not appropriately a divisional matter and that, instead, it was a matter for the Internal Affairs Division. In clear violation of departmental procedures, Captain Dale Brown thereafter called Lt. Collman and told him he could not pursue his investigation. The Chief of Police, Sam Nuchia, initially agreed with this decision. After a meeting with Assistant Chief Dennis Storemski and Captain Dale Brown, he stated that the investigation would stay in the division until Officer Sharp "comes clean." He also stated that he was not going on any "witch hunt." These inappropriate statements reveal that Chief Nuchia sanctions the long-standing policy of seeking to prohibit officers from petitioning to seek and obtain redress of grievances. Rather than properly investigating the situation, the department's first approach is to attack the victim.

Additionally, Sharp maintains:

> Even after Lieutenant Hankins, Sergeant Bice, and Sergeant Brown were reassigned to the Special Operations Division, the replacement supervisors did not provide any relief. Shortly after I submitted my administrative letters to the Internal Affairs Division, a copy of these letters was sent to Channel 11 News, and these letters, along with a news story, appeared on the nightly news. On the very next day, Sergeant Chapman met me downtown. He told me that this report humiliated the officers and that the officers would be unable to go out on community demonstrations anymore. Sergeant Chapman went on to tell me that he believed that Hankins and Bice were good supervisors, and that I had brought shame upon the unit. I did not know that Sergeant Chapman could be so callous. I wept during that conversation.

Sharp alleges that she became the victim of stalking by Bice and his wife, Nancy Bice ("Nancy"). Nancy purportedly followed her, videotaped her and her family and friends, and made "unfounded allegations" that Sharp was improperly using Mounted Patrol property and that she claimed to be on duty when she was not. Sharp's deposition testimony indicates that Hankins also followed her. Sharp maintains in her declaration that, due to the numerous acts of alleged retaliation, "I realized that my continued presence in the unit would only jeopardize my personal safety." Ultimately, Sharp requested and obtained a transfer to a position at the Houston Police Academy.

Sharp filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging sexual harassment on August 31, 1993, and a subsequent charge alleging retaliation on March 2, 1994. Sharp initiated this action on December 9, 1994.

## II. *Analysis*

### A. *The Standard for Summary Judgment*

Rule 56(c) provides that "[summary] judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Williams v. Adams,* 836 F.2d 958, 960 (5th Cir.1988). The moving party, however, need not negate the elements of the non-movant's case. *See Wallace v. Texas Tech Univ.,* 80 F.3d 1042, 1047 (5th Cir.1996); *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994).

Once a proper motion has been made, the non-moving party may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing the existence of a genuine issue for trial. *See Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Anderson,* 477 U.S. at 257, 106 S.Ct. at 2514–15; *Wallace,* 80 F.3d at 1047; *Little,* 37 F.3d at 1069, 1075. The controverted evidence must be viewed in the light most favorable to the non-movant, and all reasonable doubts must be resolved against the moving party. *See Palmer v. BRG of Ga., Inc.,* 498 U.S. 46, 49 n. 5, 111 S.Ct. 401, 402 n. 5, 112 L.Ed.2d 349 (1990); *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14; *Judwin Properties, Inc. v. United States Fire Ins. Co.,* 973 F.2d 432, 435 (5th Cir.1992). Nevertheless, neither " 'conclusory allegations' nor 'unsubstantiated assertions' will satisfy the non-movant's burden." *Wallace,* 80 F.3d at 1047 (quoting *Little,* 37 F.3d at 1075). Summary judgment is mandated if the non-movant fails to make a showing sufficient to establish the existence of an element essential to her case on which she bears the burden of proof at trial. *See Celotex Corp.,* 477 U.S. at 322, 106 S.Ct. at 2552. "In such situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552.

B. *Title VII Sexual Harassment Claim against the City*

Title VII makes it illegal for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000(e)–2(a)(1). Two principal theories of sexual harassment are cognizable under Title VII-hostile work environment and *quid pro quo. See Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 65, 106 S.Ct. 2399, 2404–05, 91 L.Ed.2d 49 (1986). A cause of action for hostile work environment requires the existence of severe or pervasive and unwelcome verbal or physical harassment of the plaintiff due to the plaintiff's membership in a protected class.

*See Vinson,* 477 U.S. at 66–67, 106 S.Ct. at 2405–06; *Sischo–Nownejad v. Merced Community College Dist.,* 934 F.2d 1104, 1109 (9th Cir.1991); *Young v. Will County Dept. of Pub. Aid,* 882 F.2d 290, 294 (7th Cir.1989); *Jones v. Flagship Int'l,* 793 F.2d 714, 719–20 (5th Cir.1986), *cert. denied,* 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987).

Hostile work environment sexual harassment occurs when an employer's conduct "has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment." *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2404–05. The United States Supreme Court has confirmed that sexually discriminatory verbal intimidation, ridicule, and insults may be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment that violates Title VII. *See Harris v. Forklift Sys. Inc.,* 510 U.S. 17, 21–22, 114 S.Ct. 367, 370–71, 126 L.Ed.2d 295 (1993) (citing *Vinson,* 477 U.S. at 65, 67, 106 S.Ct. at 2404–05, 2405–06). Whether the asserted conduct is sufficiently pervasive to create a hostile or offensive work environment must be determined from the totality of the circumstances. *See id.* at 23, 114 S.Ct. at 371. In determining whether a work environment is abusive, the court should consider such factors as "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* The test is an objective, rather than a subjective, one. *See DeAngelis v. El Paso Mun. Police Officers Ass'n,* 51 F.3d 591, 594 (5th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 473, 133 L.Ed.2d 403 (1995) (citing *Harris,* 510 U.S. at 19–20, 114 S.Ct. at 369–70).

The Fifth Circuit has set forth five elements necessary to establish a *prima facie* case of sexual harassment in the work place:

(1) the plaintiff belongs to a protected class;

(2) the plaintiff was subjected to unwelcome harassment;

(3) the harassment was based on sex;

(4) the harassment affected a term, condition, or privilege of employment; and

(5) the employer either knew or should have known of the harassment and failed to take prompt remedial action.

See *DeAngelis*, 51 F.3d at 593; *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 403 (5th Cir.1993); *Cortes v. Maxus Exploration Co.*, 977 F.2d 195, 198–99 (5th Cir.1992); *Waltman v. International Paper Co.*, 875 F.2d 468, 477 (5th Cir.1989); *Dornhecker v. Malibu Grand Prix Corp.*, 828 F.2d 307, 309 n. 3 (5th Cir.1987); *Jones*, 793 F.2d at 719–20.

▪ Here, Sharp satisfies the first prong of a *prima facie* case by virtue of her gender. Additionally, Sharp has adduced sufficient facts to raise a fact issue as to the second and third prongs of the test. A significant amount of Sharp's allegations of unwelcome harassment based on sex is corroborated by others within the Mounted Patrol Unit. As for the fourth prong, the apparent frequency and severity of the alleged incidents and the likelihood that Sharp would find them humiliating, even to the point of interfering with her ability to do her job, raise a fact issue as to whether the alleged harassment affected a term, condition, or privilege of employment. With respect to the fifth prong, the apparent pervasiveness and frequency of the alleged behavior of both Bice and Hankins, observed by others within the unit, raises a fact issue as to whether the City either knew or should have known of the atmosphere of harassment and did not take prompt remedial action to alleviate it.

▪ An employer is liable for sexual harassment only if it knew or should have known of the harassment and failed to take prompt remedial action. See *Garcia v. Elf Atochem N. Am.*, 28 F.3d 446, 451 (5th Cir. 1994); *Nash*, 9 F.3d at 404 (citing *Jones*, 793 F.2d at 720). An employee can show actual notice by proving that she complained about the perceived harassment to higher management. See *Waltman*, 875 F.2d at 478. In a situation where an employer receives notice of alleged sexual harassment and takes prompt remedial action that is reasonably calculated to end the harassment, the employer is not liable for the sexual harassment, even if the conduct complained of in fact occurred. See *Carmon v. Lubrizol Corp.*, 17 F.3d 791, 794–95 (5th Cir.1994). " 'What is appropriate remedial action will necessarily depend on the particular facts of the case-the severity and persistence of the harassment, and the effectiveness of any initial remedial steps.' " *Garcia*, 28 F.3d at 451 (quoting *Waltman*, 875 F.2d at 479).

In this case, the City contends that because it took relatively prompt remedial action after a "formal" complaint was filed, it should be absolved from liability in this case. The City argues that "the attempt to show that the City had constructive knowledge of sexual harassment by showing that the harassers were aware of what they did is disingenuous," pointing to a handful of Fifth Circuit cases in which the plaintiff's case failed despite apparent knowledge of the alleged harassment on the part of a supervisor. That authority, however, is inapposite to the specific circumstances presented here. This is not a situation, for example, where the plaintiff failed to file a response to the defendant's motion for summary judgment, leaving the defendant's factual assertions essentially uncontroverted. See *Nash*, 9 F.3d at 402. It is similarly not a case where an individual supervisor, accused of harassment, dealt with the problem promptly enough to dispel any notion that the employer was guilty of inaction despite knowledge of the harassment. See *Indest v. Freeman Decorating*, Civil A No. 95–16, 1996 WL 61779, at *3 (E.D.La. Feb.12, 1996) (citing *Jones*, 793 F.2d at 722).

Here, there is ample evidence that at least two levels of management-Sharp's immediate supervisor, Bice, as well as his supervisor, Hankins-had notice of the hostile environment. Indeed, they were the source of the harassment. Sgt. Brown was also aware of the environment and was told about Bice's kissing Sharp on the ear immediately after the incident occurred in February 1993. Further, assuming that none of the other relevant managerial personnel in this situation had reason to know of the evidently pervasively hostile atmosphere, Sharp's request for a transfer due to her expressed discomfort with the situation served as actual notice to Sgt. Brown. Nevertheless, there was a five-month delay before the transfer

was effected and no remedial action was taken in the interim. Nuchia acknowledged at deposition that Sgt. Brown's "responsibility as a supervisor and as a friend of Officer Sharp's was not to let [the harassment] continue, either through confronting Hankins and making it stop, which he didn't do, or reporting it. And as a supervisor, his job was to report it, period, end of story." Nuchia also testified that he told Sgt. Brown that "he would have to take responsibility for what he didn't do because he was a supervisor and had those responsibilities . . . . "

██ In large part, the testimony of Jones and officers within the unit makes clear that the offensive incidents frequently occurred out in the open, in front of several people at a time. Further, as Sharp points out, "absence of notice to an employer does not necessarily insulate that employer from liability." *Vinson*, 477 U.S. at 72, 106 S.Ct. at 2408 (citing RESTATEMENT (SECOND) OF AGENCY §§ 219–237 (1958)). Although Sharp may have kept to herself her feelings of being harassed for far too long, that would not change the fact that the harassment was out in the open for all, including the supervisors, at the Mounted Patrol Unit to see. Nuchia, for example, all but concedes as much. Sharp can demonstrate constructive notice by "showing the pervasiveness of the harassment, which gives rise to the inference of knowledge or constructive knowledge." *Canutillo Indep. Sch. Dist. v. Leija*, 101 F.3d 393, 401 (5th Cir. 1996) (quoting *Waltman*, 875 F.2d at 477 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 899 (11th Cir.1982))); *accord Hirase–Doi v. United States West Communications*, 61 F.3d 777, 784 (10th Cir.1995); *Hirschfeld v. New Mexico Corrections Dep't*, 916 F.2d 572, 577 (10th Cir.1990); *Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1016 (8th Cir.1988).

In summary, the allegations made by Sharp and the corroborating evidence provided by others raise fact issues as to the existence and pervasive nature of the alleged sexual harassment and whether it affected a term, condition, or privilege of her employment. Fact issues also exist as to the actual or constructive knowledge of the purported harassment on the part of the City and whether the City took prompt remedial ac-

tion. Therefore, summary judgment is inappropriate with respect to Sharp's claim of sexual harassment under Title VII.

**C. *Title VII Retaliation Claim against the City***

██ Sharp complains that she was subjected to retaliation in violation of 42 U.S.C. § 2000e–3(a) after "she told Sgt. Dziedzic that she had been sexually harassed."

To establish a *prima facie* case of retaliation under Title VII, the plaintiff must show:

(1) she participated in statutorily protected activity;

(2) an adverse employment action occurred; and

(3) a causal connection exists between the protected activity and the adverse action.

*See Goff v. Continental Oil Co.*, 678 F.2d 593, 599 (5th Cir.1982) (citing *Dickerson v. Metropolitan Dade County*, 659 F.2d 574, 580–81 (5th Cir.1981)); *accord Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1092 (5th Cir. 1995); *Pierce v. Texas Dept. of Criminal Justice*, 37 F.3d 1146, 1151 (5th Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1957, 131 L.Ed.2d 849 (1995); *Barrow v. New Orleans S.S. Assn.*, 10 F.3d 292, 297 (5th Cir. 1994); *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 42 (5th Cir.1992). In order to maintain an action for retaliation, an employee need only establish that she had a reasonable belief that discriminatory practices existed. *See De Anda v. St. Joseph Hosp.*, 671 F.2d 850, 853 n. 2 (5th Cir.1982). In addition, the employee must demonstrate that her opposition to unlawful activity was a motivating or determining factor in the adverse employment action taken by her employer, *i.e.*, there must be a causal connection. *See Jack v. Texaco Research Ctr.*, 743 F.2d 1129, 1131 (5th Cir.1984); *McMillan v. Rust College, Inc.*, 710 F.2d 1112, 1116 (5th Cir.1983). Thus, the plaintiff must show that she would not have been subjected to the adverse action "but for" the protected activity. *See Mayberry*, 55 F.3d at 1092; *Jack*, 743 F.2d at 1131.

██ Here, Sharp has satisfied the first prong of the *prima facie* case requirement.

She participated in statutorily protected behavior by complaining to HPD officials and to the EEOC about sexual harassment in the workplace. She also alleges that after she complained, she was, among other things, shunned by her colleagues, excluded from morning roll call, had her saddle tampered with, and was not assisted by patrol unit members when she was involved in an automobile accident "a mere stone's throw from the offices of Mounted Patrol." She also contends that a banquet was held "to honor the suspended supervisor's [sic], Lieutenant Hankins and Sergeant Bice." Sharp has failed, however, to adduce sufficient evidence to raise a fact issue as to the second prong-that an adverse employment action occurred as a result of her complaints.

■■■ "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Dollis v. Rubin,* 77 F.3d 777, 781–82 (5th Cir.1995) (citing *Page v. Bolger,* 645 F.2d 227, 233 (4th Cir.)) (noting that Title VII discrimination cases have focused upon ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating), *cert. denied,* 454 U.S. 892, 102 S.Ct. 388, 70 L.Ed.2d 206 (1981); *see also Mattern v. Eastman Kodak Co.,* 104 F.3d 702, 707 (5th Cir.1997). In *Dollis,* the court found that an employee's allegations that she was not considered for a promotion, was not permitted to attend a training conference, had her work criticized by a government vendor, was given false information regarding aspects of her employment, and was denied a desk audit were not actionable adverse personnel actions. *See* 77 F.3d at 779–82. The Fifth Circuit concluded that none of the employee's complaints rose to the level of an "ultimate employment decision that Title VII was intended to address." *Id.* at 782. Similarly, in *Mattern,* the Fifth Circuit found that hostility displayed by fellow employees, having tools stolen, supervisors visiting the plaintiff's home after she called in sick, a verbal threat of being fired, a reprimand for not being at her assigned station, a missed pay increase, and being placed on "final warning" did not constitute adverse employment ac-

tions prohibited by Title VII. *See* 104 F.3d at 707–08. The court explained that "Title VII's anti-retaliation provision refers to ultimate employment decisions, and not to an 'interlocutory or mediate' decision which can lead to an ultimate decision." *Id.* at 708. The court reasoned:

> To hold otherwise would be to expand the definition of 'adverse employment action' to include events such as disciplinary filings, supervisor's reprimands, and even poor performance by the employee-anything which *might* jeopardize employment in the future. Such expansion is unwarranted.

*Id.* (emphasis in original).

Thus, under existing Fifth Circuit precedent, although the alleged behavior of Sharp's superiors and co-workers after she complained may have been thoughtless and insensitive, the allegations simply do not rise to the level of adverse employment actions cognizable under Title VII. "Doubtless, some of these actions may have had a tangential effect on conditions of employment; but, as in [Sharp's] case, an ultimate employment decision had not occurred." *Id.* Therefore, summary judgment is warranted with respect to Sharp's Title VII retaliation claim against the City.

### D. Section 1983 Claims against Brown, Storemski, and Nuchia

Sharp states in her response to the defendants' motion for summary judgment that "Officer Sharp has now voluntarily dismissed her claims against Chief Nuchia, Chief Storemski and Captain Brown individually." Accordingly, with respect to the § 1983 claims against Brown, Storemski, and Nuchia, the defendants' motion is moot.

### E. Section 1983 Claims against the City

Sharp claims that the City is responsible for "pervasive departmental misconduct" in violation of 42 U.S.C. § 1983.

Section 1983 provides a vehicle for redressing the violation of federal law by those acting under color of state law. *See Middlesex County Sewerage Auth. v. National Sea*

*Clammers Ass'n,* 453 U.S. 1, 19, 101 S.Ct. 2615, 2625–26, 69 L.Ed.2d 435 (1981); *Maine v. Thiboutot,* 448 U.S. 1, 4, 100 S.Ct. 2502, 2504, 65 L.Ed.2d 555 (1980). Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights conferred elsewhere. *See Albright v. Oliver,* 510 U.S. 266, 271, 114 S.Ct. 807, 811–12, 127 L.Ed.2d 114 (1994). To prevail on a § 1983 claim, the plaintiff must prove that a person acting under the color of state law deprived her of a right secured by the Constitution or laws of the United States. *See* 42 U.S.C. § 1983; *Daniels v. Williams,* 474 U.S. 327, 330, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986); *Augustine v. Doe,* 740 F.2d 322, 324 (5th Cir.1984). Thus, for Sharp to recover, she must establish that the defendants deprived her of a right guaranteed by the Constitution or laws of the United States. *See Baker v. McCollan,* 443 U.S. 137, 139, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979); *Thomas v. Sams,* 734 F.2d 185, 191 (5th Cir.1984), *cert. denied,* 472 U.S. 1017, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985).

The United States Supreme Court has expressly held that municipalities may be sued directly under § 1983 where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Department of Social Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978); *see Languirand v. Hayden,* 717 F.2d 220, 223 (5th Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2656, 81 L.Ed.2d 363 (1984). A municipality may also be sued "for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell,* 436 U.S. at 690–91, 98 S.Ct. at 2036; *see also Languirand,* 717 F.2d at 223. A city, however, does not incur liability under § 1983 unless a direct causal link exists between the alleged constitutional deprivation and the municipal policy or custom. *See Piotrowski v. City of Houston,* 51 F.3d 512, 517 (5th Cir.1995); *Burns v. City of Galveston,* 905 F.2d 100, 102 (5th Cir. 1990). Furthermore, a municipality may not be held liable for the acts of its employees under a theory of *respondeat superior. See Monell,* 436 U.S. at 694, 98 S.Ct. at 2037; *Piotrowski,* 51 F.3d at 517; *Colle v. Brazos County,* 981 F.2d 237, 244 (5th Cir.1993); *Rodriguez v. Avita,* 871 F.2d 552, 554 (5th Cir.), *cert. denied,* 493 U.S. 854, 110 S.Ct. 156, 107 L.Ed.2d 114 (1989); *Hickman v. Lively,* 897 F.Supp. 955, 958 (S.D.Tex.1995). "Municipalities are not vicariously liable for the actions of their employees under § 1983. Municipal liability only inures when the execution of a local government's policy or custom causes the injury." *Baker v. Putnal,* 75 F.3d 190, 200 (5th Cir.1996).

### 1. Municipal Policy or Custom

The Supreme Court has identified two types of "policies" under which a municipality may be held liable. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 480–81, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986). One type of "policy" is characterized by formal rules and understandings which constitute fixed plans of action to be followed under similar circumstances consistently and over time. *See id.* Another type of "policy" exists when a municipality takes a course of action tailored to a specific situation and not intended to control decisions in later situations. *See id.* at 481, 106 S.Ct. at 1299. Under this second type of "policy," a municipality can be liable only if the decision to adopt that particular course of action is properly made by that government's authorized decision makers. *See id.* Such "authorized decision makers" are defamed to be officials "whose acts or edicts may fairly be said to represent official policy" and whose decisions may therefore give rise to municipal liability under § 1983. *See id.* at 480, 106 S.Ct. at 1299 (quoting *Monell,* 436 U.S. at 694, 98 S.Ct. at 2037–38). The Fifth Circuit has held that, under *Monell,* when a final policy maker makes a decision, and that decision is within the sphere of the policy maker's final authority, "the existence of a well-established, officially-adopted policy will not insulate the municipality from liability." *Bennett v. Pippin,* 74 F.3d 578, 586 (5th Cir.), *cert. denied,* — U.S. ——, 117 S.Ct. 68, 136 L.Ed.2d 29 (1996) (quoting *Gonzalez v. Ysleta Indep. Sch. Dist.,* 996 F.2d 745, 754 (5th Cir.1993)).

With respect to official policy or custom, "[a]llegations of an isolated incident are not sufficient to show the existence of a custom or policy." *Fraire v. City of Arlington,* 957 F.2d 1268, 1278 (5th Cir.), *cert. denied,* 506 U.S. 973, 113 S.Ct. 462, 121 L.Ed.2d 371 (1992) (citing *Rodriguez,* 871 F.2d at 554); *accord Palmer v. City of San Antonio,* 810 F.2d 514, 516 (5th Cir.1987). " 'Isolated violations are not the persistent, often repeated constant violations that constitute custom and policy' as required for municipal section 1983 liability." *Campbell v. City of San Antonio,* 43 F.3d 973, 977 (5th Cir.1995) (quoting *Bennett v. City of Slidell,* 728 F.2d 762, 768 n. 3 (5th Cir.1984), *cert. denied,* 472 U.S. 1016, 105 S.Ct. 3476, 87 L.Ed.2d 612 (1985)). The Fifth Circuit has defined official policy as:

1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

2. A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority.

*Johnson v. Moore,* 958 F.2d 92, 94 (5th Cir. 1992) (quoting *Bennett,* 735 F.2d at 862); *accord Eugene v. Alief Indep. Sch. Dist.,* 65 F.3d 1299, 1304 (5th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1680, 134 L.Ed.2d 782 (1996).

The Supreme Court has held that state law determines whether a particular individual is a final decision maker of a governmental entity with respect to a certain sphere of activity. *See Pippin,* 74 F.3d at 586 (citing *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2723–24, 105 L.Ed.2d 598 (1989); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 124, 108 S.Ct. 915, 924–25, 99 L.Ed.2d 107 (1988); *Doe v. Rains County Indep. Sch. Dist.,* 66 F.3d 1402, 1407 (5th Cir.1995)). Here, General Order No. 300–II, setting forth the HPD's sexual harassment policy, signed by Nuchia as Chief of Police, as well as a number of General Orders setting forth other policies of the HPD, signed either by Nuchia or former Chief of Police Lee P. Brown, are before the court. These policy statements indicate that the Chief of Police of Houston has wide ranging "policy-making authority" and is the final decision maker with respect to operations of the HPD.

In her response to the motion for summary judgment, Sharp makes reference to three purported "customs" of the HPD which she contends abridged her rights. The first is an alleged "code of silence" which "operated to discourage Officer Sharp from filing a written complaint about the unlawful treatment to which she was subjected, because officers learn from the time they receive their initial training in the Academy that they are not to report misconduct of other officers and that, when asked about any misconduct, they should say merely that they do not recall the event." The second custom mentioned is one that "operates to keep sexual harassment complaints, when made, from being properly investigated" and is supposedly an "offshoot" of the code of silence. The third custom alleged is that "the Police Department retaliates against those officers who complain of sexual harassment."

As to the alleged custom regarding a code of silence, Nuchia's deposition testimony indicates that he may have been aware of the existence of such a custom:

Q. My question was, what is your thinking as to why no officer who is currently at Mounted Patrol remembered that [the sexual harassment] had happened?

A. Human beings in small groups tend not to make waves. And it's very likely that there are several of them that either because they were concerned about their own position in that unit and didn't want to risk that, or because they liked Hankins and thought he was cute and funny, those kinds of things that people do in groups, whether they be police officers, doctors or lawyers or judges or people in business,

it's one of the characteristics of small groups that can happen.

Furthermore, Nuchia's testimony indicates that he was not convinced that Johnson "told everything she knew" during the investigation. He also expressed concern about the truthfulness of Hankins, Bice, Kennedy, and Johnson. In addition, the following exchange occurred:

Q: Is it true that you believe that Sergeant Brown acted in a cowardly fashion for not bringing forward complaints of sexual harassment to his supervisors?

A: The reasons that he gave were cowardly. He said he was afraid of Lieutenant Hankins.

In her declaration, Sharp confirms that "Nuchia stated that he was disappointed that some of the officers lied." Indeed, there is corroborating testimony from Jones, Nuchia, Sergeant Tim McNamara ("McNamara"), the officer who headed up the IAD investigation, and others that reflects that there was a tendency among officers to be evasive or even untruthful when allegations of officer misconduct arose. In addition, Bice reportedly made a comment during roll call advising that they "stick to" their story.

As for a custom of retaliation, Nuchia indicated at deposition that he was aware that some form of repercussions could be expected by Sharp. In response to Sharp's inquiry about staying in the Mounted Patrol Unit, he testified: "I told her that we could control generally what they did and generally how they acted but not specifically control their minds or their feelings toward her. But that, in my experience, in situations like this, if a person stays with it and keeps their chin up that within about a year people get over it and forget about it and go on, especially with new supervisors and new leadership." Additionally, Nuchia testified: "It's not unusual when there is bad blood and they resent a particular thing that they try to get back at the people that do it to them. And if there are in fact things going on in a unit that are inappropriate, it's not unusual for the person, even though his conduct may or may not have been appropriate, to say 'Hey, if you are going to accuse me of doing something wrong, then I will tell what you did wrong.'"

The following exchange also occurred at Nuchia's deposition:

Q. Did you expect Officer Sharp to suffer retaliation for coming forward with allegations of sexual harassment?

A. I expected that some of the officers would not treat her with the same level of friendliness that they probably did before it came about. Because, like I said, there were some officers that liked Hankins, for whatever reasons. And I expected that those officers would no longer-if they were friends to begin with, that some of those would not treat her as a friend. Past treating her formally or as an acquaintance rather than a friend, I expected no retaliation.

When asked why a supervisor at Mounted Patrol would not mention during roll call Sharp's complaints about shunning or people scratching her name off the list for overtime work and extra jobs, Nuchia responded that "sometimes in these kinds of instances you make it worse when you call attention to it than you do by holding it back and watching what's going on and trying to catch the person or let it run its course if it's minor." At deposition, Sharp recalled that Nuchia had told her that it was her "destiny" to face retaliation and that the repercussions would probably last about a year. Sharp also testified that "you don't complain about supervisors...without repercussions."

Under these circumstances, there is a fact issue as to whether a code of silence existed and was "so common and well settled as to constitute a custom that fairly represents municipal policy." *Johnson*, 958 F.2d at 94. There is also a fact issue as to whether there was a custom of retaliating against those who broke the code. The evidence suggests that there may well have been a code of silence operating to squelch complaints against officers, and in turn, a custom of retaliating against those who broke the alleged code. Finally, a fact issue exists as to whether Nuchia, as the policy maker for the HPD, had "actual or constructive knowledge" of these alleged customs.

Sharp, however, fails to adduce sufficient evidence of a custom or practice of ensuring

that allegations of sexual harassment are not investigated properly. Sharp makes much over the fact that the investigation of Devora's complaint began as a divisional inquiry in June 1993. The inquiry had been, as acknowledged by Sharp, upgraded to an IAD inquiry by July 28, 1993. A document entitled "Chronology of Events as Related to Sergeant J.W. Brown" lists July 22, 1993, as the date that the "investigation of sexual harassment was turned over to IAD by Captain Brown to Lieutenant Coleman." The chronology gives July 21, 1993, as the date of Sharp's letter verifying the urinating incident, reporting the dropping the pants incident, and alluding to sexual harassment without details. The chronology lists July 30, 1993, as the date of "Sharp's letter detailing all of the sexual harassment incidents, first report of the following: ear kissing incident; crotch in face & zipper incident; grabbing crotch." Dziedzic's investigation of the Devora complaint began in July 1993. Ultimately, both Bice and Hanins were suspended from duty for ninety days and transferred. Moreover, the numerous allegations made by Sharp that a concerted effort was made, reaching to the highest echelons of HPD, to see to it that her complaint was not investigated, and that "Assistant Chief Dennis Storemski and Captain Dale Brown intentionally circumvented departmental orders in performing an 'internal inquiry'" of the matter, are unsubstantiated. There is no indication as to how Sharp would have knowledge of the private conversations between Brown, Storemski, and Nuchia, and the record is devoid of any corroboration of the statements allegedly made. As noted above, conclusory allegations and unsubstantiated assertions are insufficient to satisfy Sharp's burden on summary judgment. *See Wallace*, 80 F.3d at 1047.

While the investigation may not have been perfect, and although there may have been some delay in transferring the investigation to the LAD, to suggest that the delay and the type of initial investigation were a result of a policy or custom on the part of the City is unfounded. As the court commented in *Jarman v. City of Northlake*, "Although [the City's] five-month delay in responding to [the plaintiff's] harassment complaint may not

qualify as an 'immediate' response so as to insulate the City from Title VII liability ..., we think it is sufficiently responsive to contradict [the plaintiff's] claim that [the City] had a 'custom or policy' of nonresponse to harassment complaints." 950 F.Supp. 1375, 1382 (N.D.Ill.1997).

### 2. *Constitutional Claims*

The City maintains that Title VII provides Sharp's exclusive remedy, contending that "allegations of discriminatory treatment in connection with public employment that form the basis of a Title VII claim cannot form the basis of a second, separate claim under § 1983 as well." *Jackson v. City of Atlanta*, 73 F.3d 60, 63 (5th Cir.), *cert. denied*, —— U.S. ——, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996); *see Irby v. Sullivan*, 737 F.2d 1418, 1428–30 (5th Cir.1984). In *Jackson*, the Fifth Circuit held that Title VII provided the plaintiff's sole remedy for race discrimination, as his putative § 1983 claims arose from precisely the same allegedly discriminatory acts as did his Title VII claim. *See* 73 F.3d at 63. The court explained:

> Congress intended for Title VII-with its own substantive requirements, procedural rules, and remedies-to be the exclusive means by which an employee may pursue a discrimination claim. Allowing a plaintiff to state a discrimination claim under § 1983 as well would enable him to sidestep the detailed and specific provisions of Title VII.

*Id.* A plaintiff, however, can "pursue a remedy under § 1983 as well as under Title VII when the employer's conduct violates both Title VII and a separate *constitutional or statutory right.*" *See id.* at n. 13 (emphasis in original) (citing *Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1573 (5th Cir.1989), *cert. denied*, 493 U.S. 1019, 110 S.Ct. 718, 107 L.Ed.2d 738 (1990)); *accord Wilson v. UT Health Ctr.*, 973 F.2d 1263, 1268 (5th Cir.1992), *cert. denied*, 507 U.S. 1004, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993). In *Jackson*, the plaintiff failed to identify a separate constitutional or statutory right, alleging racial discrimination as the sole basis for his § 1983 claim. *See id.*

Sharp states in her complaint and in her response to the motion for summary judgment that the defendants' actions deprived her of rights, privileges, and immunities secured by the Constitution of the United States, specifically the First and Fourteenth Amendments. Although neither the Supreme Court nor the Fifth Circuit has addressed this precise issue, the weight of authority permits a public employee to maintain an action for sexual harassment under both Title VII and § 1983, finding sexual harassment to constitute a violation of a separate constitutional right-equal protection under the Fourteenth Amendment. *See, e.g., David v. City & County of Denver*, 101 F.3d 1344, 1354 (10th Cir.1996); *Annis v. County of Westchester*, 36 F.3d 251, 254–55 (2d Cir.1994); *Beardsley v. Webb*, 30 F.3d 524, 529 (4th Cir.1994); *Lankford v. City of Hobart*, 27 F.3d 477, 481 (10th Cir.1994); *Gierlinger v. New York State Police*, 15 F.3d 32, 34 (2d Cir. 1994); *Pontarelli v. Stone*, 930 F.2d 104, 113–14 (1st Cir.1991); *Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 576 (2d Cir.1989); *Starrett v. Wadley*, 876 F.2d 808, 814 (10th Cir.1989); *Poe v. Haydon*, 853 F.2d 418, 429 (6th Cir.1988), *cert. denied*, 488 U.S. 1007, 109 S.Ct. 788, 102 L.Ed.2d 780 (1989); *Bohen v. City of East Chicago*, 799 F.2d 1180, 1185 (7th Cir.1986); *see also Roberts v. College of the Desert*, 870 F.2d 1411, 1415 (9th Cir.1989); *Headley v. Bacon*, 828 F.2d 1272, 1275 (8th Cir.1987); *cf. Davis v. Passman*, 442 U.S. 228, 234–35, 99 S.Ct. 2264, 2271, 60 L.Ed.2d 846 (1979). These courts reason that Title VII does not preempt an action under § 1983 for violation of the Fourteenth Amendment, even if the same facts underlie both causes of action, rejecting the notion that Title VII provides the exclusive remedy for employment discrimination. *See, e.g., Annis*, 36 F.3d at 254–55; *Starrett*, 876 F.2d at 814; *Roberts*, 870 F.2d at 1415.

 A municipality, however, cannot be held liable for sexual harassment under § 1983 unless the plaintiff can show that the alleged sexual harassment was undertaken pursuant to a municipal policy or custom. *See Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 (3d Cir.1990); *Carrero*, 890

F.2d at 577; *Starrett*, 876 F.2d at 819–820; *Jarman*, 950 F.Supp. at 1381–82. In the instant case, there is no indication that the HPD had an official policy of endorsing or even condoning sexual harassment. In fact, the evidence is to the contrary, as reflected by the HPD's written policy regarding sexual harassment embodied in General Order No. 300–1 1. Two versions of this policy are before the court, one dated December 3, 1987, and the other December 14, 1992, both of which expressly state, "The Houston Police Department prohibits sexual harassment among it employees and is committed to eliminating negative or destructive patterns of behavior, such as sexual harassment, within the workplace." Neither Bice nor Hankins could be considered, nor does Sharp assert, that they are policy makers of the HPD so as to render their alleged actions the official policy of the City. Similarly, there is no evidence that sexual harassment was so widespread and pervasive within the HPD as to establish a municipal custom. *See Starrett*, 876 F.2d at 820. Therefore, because Sharp has adduced no evidence of a policy or custom of sexual harassment within the HPD, she has no cognizable § 1983 claim against the City for violation of her equal protection rights under the Fourteenth Amendment.

 Furthermore, although claims of retaliation are commonly brought under the First Amendment and may also be brought under Title VII, retaliation claims growing out of complaints of employment discrimination have not been recognized under the equal protection clause of the Fourteenth Amendment. *See, e.g., Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir.1996); *Ratliff v. De-Kalb County*, 62 F.3d 338, 340–41 (11th Cir. 1995); *Gray v. Lacke*, 885 F.2d 399, 414 (7th Cir.1989), *cert. denied*, 494 U.S. 1029, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990); *Yatvin v. Madison Metro. Sch. Dist.*, 840 F.2d 412, 418–19 (7th Cir.1988); *Tafoya v. Adams*, 816 F.2d 555, 558 (10th Cir.1987), *cert. denied*, 484 U.S. 851, 108 S.Ct. 152, 98 L.Ed.2d 108 (1987). As the Eleventh Circuit recently noted, "no established right exists under the equal protection clause to be free from retaliation." *Ratliff*, 62 F.3d at 341. Thus,

Sharp's retaliation claim is not actionable under § 1983 via the Fourteenth Amendment.

With respect to her First Amendment retaliation claim, Sharp is not foreclosed from proceeding under § 1983 because she relies on a recognized constitutional right separate and independent from the retaliation provisions of Title VII. *See Johnston,* 869 F.2d at 1573.

> Our interpretation of the relationship between Title VII and § 1983 does not disturb our holding in *Irby v. Sullivan.* Although Title VII supplements and overlaps § 1983, it remains an exclusive remedy when a state or local employer violates only Tide VII. When, however, unlawful employment practices encroach, not only on rights created by Title VII, but also on rights that are independent of Tide VII, Title VII ceases to be exclusive. At this point, § 1983 and Title VII overlap, providing supplemental remedies. All circuit courts that have had occasion to consider the issue have reached the same conclusion. . . .

*Id.* at 1576 (citations omitted). In *Johnston,* the court held that the employer's conduct violated two independent rights: the plaintiff's right under Title VII to be free from retaliation for testifying at an EEO hearing and his right under the First Amendment to testify freely before the Commissioner's Court. *See id.* The court found that liability was properly imposed on the employer under both Title VII and § 1983. Therefore, in this situation, Sharp can proceed under § 1983 with regard to her First Amendment retaliation claim against the City. *See Wilson,* 973 F.2d at 1268–70.

■ Sharp may establish a claim under the First Amendment by showing that she engaged in protected speech and that such activity was a substantial and motivating factor in an adverse action against her. *See Mount Healthy City Sch. Dist. Bd. Of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977). A state or other governmental entity may not condition public employment on grounds that infringe on its employees' constitutionally protected right to freedom of expression. *See Johnston,* 869

F.2d at 1577 (citing *Rankin v. McPherson,* 483 U.S. 378, 383, 107 S.Ct. 2891, 2896, 97 L.Ed.2d 315 (1987)). To be protected under the First Amendment, an employee's speech must address a matter of public concern. *See Rankin,* 483 U.S. at 384, 107 S.Ct. at 2896–97; *Connick v. Myers,* 461 U.S. 138, 146–48, 103 S.Ct. 1684, 1689–91, 75 L.Ed.2d 708 (1983); *Johnston,* 869 F.2d at 1577. "Speech regarding matters of public interest 'is more than self-expression; it is the essence of self-government.'" *Davis v. Ector County,* 40 F.3d 777, 782 (5th Cir.1994) (quoting *Connick,* 461 U.S. at 145, 103 S.Ct. at 1689). "There is perhaps no subset of 'matters of public concern' more important than bringing official misconduct to light." *Id.* Reports of sexual harassment on the part of public employees are manifestly a matter of public concern. *See id.* at 783; *Wilson,* 973 F.2d at 1269.

In addition, a determination of whether a public employer has abridged an employee's First Amendment rights requires the court to weigh competing interests-balancing "the employee's interest, as a citizen, in commenting on issues of public concern against the state's interest, as an employer, in 'promoting the efficiency of the public services it performs through its employees.'" *Johnston,* 869 F.2d at 1577 (quoting *Rankin,* 483 U.S. at 384, 107 S.Ct. at 2897). In striking this balance, it appears that Sharp's interest in voicing her concerns about sexual harassment outweighed any interest of the HPD in promoting efficient services. *See Davis,* 40 F.3d at 783–84; *Wilson,* 973 F.2d at 1270. Indeed, a greater efficiency would seem to be achieved if police officers refrain from engaging in sexual harassment while on duty.

■ In her second EEOC charge, Sharp detailed her allegations of retaliation for speaking out about sexual harassment:

> The ostracism I receive from supervisors and co-workers continues to be harsh to his day. In fact, it is escalating. The retaliation ranges from shunning (i.e., not speaking, turning their backs on me, placing my horse away from the other horses, and conducting roll call in the reception area while I remain in the roll-call room) to even more egregious behavior (i.e., re-

peatedly removing my name from overtime functions and altering the tack on my horse). These behaviors started after I reported the sexual harassment to which I have been subjected and I believe these behaviors are designed to punish me for making these allegations.

I have repeatedly attempted to resolve these matters by bringing them to the attention of my current supervisor. Note that my previous supervisor was transferred in December after I confided in him about sexual harassment. It appears, based on the continued retaliation, that my current supervisor has ignored, rather than addressed, my complaints. This only encourages the retaliation. This is not only an emotionally difficult situation, but one that could cause potential injury. For example, I am fortunate that I was attentive enough to discover that someone had dismantled my stirrup while I was at lunch on February 22, 1994. Had I not noticed this, I could have been injured when I tried to mount my horse.

She further described the incident of January 18, 1994, in which she was involved in an automobile accident, and no one from Mounted Patrol came to her aid. She also mentioned the January 27, 1994, banquet allegedly held to "honor" the suspended Bice and Hankins. Sharp took the banquet as a "clear slap in the face and sign to me that retaliation will not only continue, but escalate."

Case law reflects that a more expansive reading of the term "adverse employment action" may apply with respect to retaliation claims brought under § 1983 asserting a First Amendment violation than for those brought under Title VII. In *Rutan v. Republican Party of Ill.*, the Supreme Court held that First Amendment concerns are implicated not merely when public employees are terminated based upon their political views but also when lesser actions such as hiring, promotion, transfer, and recall are at issue. *See* 497 U.S. 62, 72, 110 S.Ct. 2729, 2735–36, 111 L.Ed.2d 52 (1990). The Fifth Circuit subsequently applied *Rutan* to claims of retaliation for speaking out about matters of public concern. *See Click v. Copeland,* 970 F.2d 106, 110–11 (5th Cir.1992); *Dorsett v.*

*Board of Trustees for State Colleges & Univs.,* 940 F.2d 121, 123 (5th Cir.1991). In *Pierce,* the Fifth Circuit discussed the potentially broad sweep of harm actionable via First Amendment retaliation claims in view of footnote 8 of the *Rutan decision. See Pierce,* 37 F.3d at 1149 n. 1. Footnote 8 of *Rutan* states that "the First Amendment, as the court below noted, already protects state employees not only from patronage dismissals but also from 'even an act of retaliation as trivial as failing to hold a birthday party for a public employee . . . when intended to punish her for exercising her free speech rights.' " 497 U.S. at 76 n. 8, 110 S.Ct. at 2737 n. 8. Some courts have applied *Rutan's* footnote 8 as the standard for actionable harm in First Amendment retaliation claims. *See, e.g., Tao v. Freeh,* 27 F.3d 635, 639 (D.C.Cir.1994).

The Fifth Circuit, however, has declined to ascribe this degree of breadth to retaliation proscribed by the First Amendment, finding footnote 8 to be inconsistent with the body of the opinion and largely *dicta. See Pierce,* 37 F.3d at 1149 n. 1. In *Pierce,* the court stated that "we apply the main analysis of *Rutan* to retaliation claims and require more than a trivial act to establish constitutional harm." *Id.* Specifically, the Fifth Circuit explained:

> To establish a First Amendment violation, a public employee must demonstrate that she has suffered an adverse employment action for exercising her right to free speech. *McCabe v. Sharrett,* 12 F.3d 1558, 1563 (11th Cir.1994). Adverse employment actions are discharges, demotions, refusals to hire, refusals to promote, and reprimands. *Id.*

*Pierce,* 37 F.3d at 1149. This list of adverse employment actions, however, appears not to be exclusive. *See, e.g., Vojvodich v. Lopez,* 48 F.3d 879, 887 (5th Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 169, 133 L.Ed.2d 111 (1995); *McCabe,* 12 F.3d at 1563–64; *Goffer v. Marbury,* 956 F.2d 1045, 1049 n. 1 (11th Cir.1992). In fact, the court in *Pierce* did not merely rely on its "short list" of adverse actions; instead, it evaluated whether the employment actions at issue could be regarded as punishment of the employee and analyzed whether they had led to adverse results. *See* 37 F.3d at 1150.

**1180**

Additionally, the *Pierce* court cited with approval the approach of Judge Garwood, dissenting in *Scott v. Flowers*. *See Pierce,* 37 F.3d at 1150 n. 1; *Scott v. Flowers,* 910 F.2d 201, 216 n. 32 (5th Cir.1990) (Garwood, J., dissenting). In *Scott,* Judge Garwood pointed out that the Seventh Circuit's language in *Rutan,* quoted by the Supreme Court, was in turn characterizing another Seventh Circuit decision in which the court actually held that although failing to have a birthday party is not enough by itself to be actionable under § 1983, "an entire campaign of harassment which though trivial in detail may have been substantial in gross" may indeed be actionable. *See Scott,* 910 F.2d at 216 n. 32 (quoting *Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982)). Further, the *Bart* court held that "[i]t is a question of fact whether the campaign reached the threshold of actionability under section 1983." 677 F.2d at 625. Hence, a series of retaliatory acts, while not separately actionable, might in total be sufficiently chilling of First Amendment rights to be cognizable under § 1983. In this case, a fact issue exists as to whether the alleged campaign of reprisal visited upon Sharp for speaking out about sexual harassment was sufficiently severe and detrimental to be actionable under § 1983 as a violation of her First Amendment rights.

In sum, fact issues exist which preclude summary judgment on Sharp's First Amendment retaliation claim. Accordingly, although summary judgment is warranted with respect to Sharp's § 1983 claim grounded on the Fourteenth Amendment, it is improper with regard to her § 1983 claim based on the First Amendment.

III. *Conclusion*

There are no outstanding issues of material fact with respect to Sharp's retaliation claim under Title VII or her Fourteenth Amendment claim under § 1983 against the City. Accordingly, summary judgment is GRANTED as to these claims. With regard to Sharp's Title VII claims of sexual harassment and discrimination against the City as well as her § 1983 claim for deprivation of her First Amendment rights, there exist outstanding issues of material fact which pre-clude summary judgment. Therefore, summary judgment on these claims is DENIED.

IT IS SO ORDERED.